No. 23-40336

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

JOSE PAZ MEDINA-CANTU,
Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

BRIEF FOR APPELLANT

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas

KATHRYN SHEPHARD
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002-1056
Telephone: (713) 718-4600

## CERTIFICATE OF INTERESTED PERSONS

United States v. Jose Paz Medina-Cantu,
No. 23-40336

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.

1.    The Honorable Nelva Gonzales Ramos, United States District Judge.

2.    Jose Paz Medina-Cantu, Defendant-Appellant.

3.    United States of America, Plaintiff-Appellee.

4.    Counsel for Plaintiff-Appellee: United States Attorney Alamdar S. Hamdani; former United States Attorney Jennifer B. Lowery; and Assistant United States Attorneys Liesel Roscher and Carmen Castillo Mitchell.

5.    Counsel for Defendant-Appellant: Federal Public Defender Marjorie A. Meyers; and Assistant Federal Public Defenders Rachel E. Braver and Kathryn Shephard.

These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

                         s/ Kathryn Shephard
                         KATHRYN SHEPHARD

## REQUEST FOR ARGUMENT

Defendant-Appellant Jose Paz Medina-Cantu requests oral argument on the first issue, which raises an important question about the constitutionality of the prohibition of firearms possession based solely on the fact that a person is an alien unlawfully present in the United States under the framework established by a recent landmark Supreme Court decision.

He does not request oral argument on the second issue, concerning whether the statute of conviction is unconstitutional as applied to Mr. Medina-Cantu because it allowed a conviction based only on the firearm's manufacture outside of, and its subsequent importation to, the state in which it was possessed, without regard to any involvement by Mr. Medina-Cantu in such transportation or in the economic activity associated with the purchase or sale of the firearm. Mr. Medina-Cantu recognizes that this issue is foreclosed by this Court's precedent.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .........................................................i

REQUEST FOR ORAL ARGUMENT ................................................................ ii

TABLE OF CONTENTS ....................................................................................... iii

TABLE OF CITATIONS ........................................................................................v

STATEMENT OF JURISDICTION .......................................................................1

STATEMENT OF THE ISSUES ............................................................................2

STATEMENT OF THE CASE ...............................................................................3

SUMMARY OF THE ARGUMENT ......................................................................6

ARGUMENT ..........................................................................................................7

    **ISSUE ONE RESTATED**: 18 U.S.C. § 922(g)(5)(A) violates the
    Second Amendment..........................................................................................7

    A.    Standard of review...............................................................................7

    B.    *Bruen* abrogated this Court's Second Amendment precedent,
        including *Portillo-Munoz* ..................................................................7

    C.    The historical record shows that unlawfully present aliens were
        not a group that was historically stripped of their Second
        Amendment rights, and there is no historical tradition,
        particularly from the founding era, of disarmament based on that
        status ..................................................................................................12

# TABLE OF CONTENTS – (cont'd)

**Page**

**ISSUE TWO RESTATED**:     18 U.S.C. § 922(g)(5)(A) is unconstitutional as applied to Mr. Medina-Cantu because it allowed a conviction based only on the firearm and ammunition's manufacture outside of, and subsequent importation to, the state in which they were possessed, without regard to any involvement by Mr. Medina-Cantu in such transportation or in the economic activity associated with the purchase or sale of the firearm and ammunition. (Foreclosed issue.)...........20

A.      Standard of review..................................................................20

B.      18 U.S.C. § 922(g)(5)(A) is unconstitutional as applied to Mr. Medina-Cantu, as it allowed a conviction based only on the firearm and ammunition's manufacture firearm outside of, and subsequent importation to, the state in which they were possessed. ........................................................................20

CONCLUSION ......................................................................................26

CERTIFICATE OF SERVICE ..............................................................27

CERTIFICATE OF COMPLIANCE ......................................................28

# TABLE OF CITATIONS

Page

## CASES

*Alderman v. United States*, 131 S. Ct. 700 (2011) ........................................... 21-22

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................................. 8-11, 16

*Hollis v. Lynch*, 827 F.3d 436
  (5th Cir. 2016) ................................................................................................ 8

*In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787
  (5th Cir. 2021) ............................................................................................ 9-10

*Kanter v. Barr*, 919 F.3d 437
  (7th Cir. 2019) ........................................................................................ 16, 18

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .................................... 8-9, 14

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ......................... 22-24

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco,*
  *Firearms & Explosives*, 700 F.3d 185
  (5th Cir. 2012) ............................................................................................... 8

*New York State Rifle & Pistol Ass'n. Inc. v. Bruen,*
  142 S. Ct. 2111 (2022) ............................................................................ *passim*

*Scarborough v. United States*, 431 U.S. 563 (1977) ................................. 21-22, 24

*United States v. Alcantar*, 733 F.3d 143
  (5th Cir. 2013) ........................................................................................ 21, 25

*United States v. Barcenas-Rumualdo*, 53 F.4th 859
  (5th Cir. 2022) .............................................................................................. 14

*United States v. Daniels*, 77 F.4th 337
  (5th Cir. 2023) ............................................................................................... 7

# TABLE OF CITATIONS – (cont'd)

## CASES – (cont'd)

*United States v. Hill*, 927 F.3d 188
  (4th Cir. 2019) ............................................................................ 21

*United States v. Johnson*, 632 F.3d 912
  (5th Cir. 2011) ............................................................................ 20

*United States v. Kuban*, 94 F.3d 971
  (5th Cir. 1996) ............................................................................ 21

*United States v. Lopez*, 514 U.S. 549 (1995) ........................... 20-22, 25

*United States v. McGinnis*, 956 F.3d 747
  (5th Cir. 2020) .............................................................................. 8

*United States v. Morrison*, 529 U.S. 598 (2000) .................................. 25

*United States v. Orellana*, 405 F.3d 360
  (5th Cir. 2005) ............................................................................ 14

*United States v. Perez*, 6 F.4th 448
  (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1133 (2022) ......................... 15

*United States v. Perez-Macias*, 335 F.3d 421
  (5th Cir. 2003) .............................................................................. 7

*United States v. Portillo-Munoz*, 643 F.3d 437
  (5th Cir. 2011), *as revised* (June 29, 2011) .................................. 7, 11

*United States v. Rahimi*, 61 F.4th 443
  (5th Cir. 2023), *cert. granted*,
  (U.S. June 30, 2023) (No. 22-915) ............................................. *passim*

*United States v. Seekins*, 52 F.4th 988
  (5th Cir. 2022) .......................................................................... 21-22

# TABLE OF CITATIONS – (cont'd)

Page

## CASES – (cont'd)

*United States v. Seekins*, No. 21-10556, 2022 WL 3644185
  (5th Cir. Aug. 24, 2022) (unpublished) ............................................. 20

*United States v. Sitladeen*, 64 F.4th 978
  (8th Cir. 2023) ......................................................................... 11

*United States v. Snow*, 309 F.3d 294
  (5th Cir. 2002) ......................................................................... 7

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. I, § 8 ............................................... 3, 5, 20, 22-24

U.S. Const. amend. II ..................................................... *passim*

U.S. Const. amend. XIV ..................................................... 13

## STATUTES AND RULES

8 U.S.C. § 1326(a) ......................................................... 3

8 U.S.C. § 1326(b) ......................................................... 3

18 U.S.C. § 921(e)(3) ...................................................... 4

18 U.S.C. § 922 ......................................................... 21-23

18 U.S.C. § 922(g) ...................................................... 10, 23

18 U.S.C. § 922(g)(5)(A) ............................................. *passim*

18 U.S.C. § 922(g)(8) ..................................................... 18

**TABLE OF CITATIONS – (cont'd)**

<strong>Page</strong>

**STATUTES AND RULES – (cont'd)**

18 U.S.C. § 924(a)(2) ................................................................. 3

18 U.S.C. § 3742 ...................................................................... 1

28 U.S.C. § 1291 ...................................................................... 1

Chinese Exclusion Act of 1982, ch. 126, 22 Stat. 58 ........................... 17

Fed. R. App. P. 4(b)(1)(A)(i) ...................................................... 1

Fifth Cir. R. 28.2.1 .................................................................. i

**MISCELLANEOUS**

Akhil Reed Amar, *The Bill of Rights:*
  *Creation and Reconstruction* (1998) .................................... 15

Br. of *Amicus Curiae* Patrick J. Charles In Support of Neither Party,
  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  S. Ct. No. 20-843 (July 19, 2021) ....................................... 14

Patrick J. Charles, *The Fugazi Second Amendment:* Bruen's *Text, History, and*
  *Tradition Problem and How to Fix It*, 71 Clev. St. L. Rev. 623 (2023),
  https://engagedscholarship.csuohio.edu/
  cgi/viewcontent.cgi?article=4216&context=clevstlrev ................. 13-15

Saul Cornell & Nathan DeDino, *A Well Regulated Right:*
  *The Early American Origins of Gun Control,*
  73 Fordham L. Rev. 487 (2004) ....................................... 16-17

*The Declaration of Independence* (U.S. 1776) ........................... 17

Eric S. Fish, *Race, History, and Immigration Crimes,*
  107 Iowa L. Rev. 1051 (2022) .......................................... 14

## TABLE OF CITATIONS – (cont'd)

Page

### MISCELLANEOUS – (cont'd)

Erika Lee, *At America's Gates* (2003) .................................................................. 17

2 Bernard Schwartz, *The Bill of Rights:
A Documentary History* (1971) .......................................................... 18

## STATEMENT OF JURISDICTION

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1291, as this is an appeal from a final judgment of conviction and sentence entered by the United States District Court for the Southern District of Texas. Jurisdiction also lies under 18 U.S.C. § 3742.

The judgment appealed from was entered on the docket on May 31, 2023. Mr. Medina-Cantu timely filed his notice of appeal on June 2, 2023. *See* Fed. R. App. P. 4(b)(1)(A)(i).

## STATEMENT OF THE ISSUES

**ISSUE ONE**: Whether 18 U.S.C. § 922(g)(5)(A) violates the Second Amendment.

**ISSUE TWO**: Whether 18 U.S.C. § 922(g)(5)(A) is unconstitutional as applied to Mr. Medina-Cantu because it allowed a conviction based only on the firearm and ammunition's manufacture outside of, and subsequent importation to, the state in which they were possessed, without regard to any involvement by Mr. Medina-Cantu in such transportation or in the economic activity associated with the purchase or sale of the firearm and ammunition. (Foreclosed issue.)

## STATEMENT OF THE CASE

On July 13, 2022, a federal grand jury in the Corpus Christi Division of the Southern District of Texas returned a two-count indictment charging Defendant-Appellant Jose Paz Medina-Cantu with unlawful possession of a firearm and ammunition while knowing that he was an alien unlawfully in the United States, in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2) ("Count One"), and being found unlawfully present in the United States after deportation, in violation of 8 U.S.C. § 1326(a) and (b) ("Count Two"). ROA.13-14.

On November 14, 2022, Mr. Medina-Cantu filed a motion to dismiss Count One of the indictment because § 922(g)(5)(A) violates the Second Amendment. ROA.38-46. The government filed a response in opposition. ROA.48-63. On January 10, 2023, the district court entered an order denying Mr. Medina-Cantu's motion. ROA.64-75.

On February 23, 2023, Mr. Medina-Cantu appeared before the district court and pleaded guilty to the indictment, without a plea agreement. ROA.128, 132-133, 137. Mr. Medina expressly preserved his motion to dismiss Count One and the foreclosed argument that § 922(g)(5)(A) violates the Commerce Clause. ROA.140-141.

In support of the guilty plea, the government proffered that:

[PROSECUTOR]: On June 20th of 2022, Border Patrol agents at the Falfurrias Border Patrol Checkpoint received information that an

3

ambulance would be arriving with persons illegally present in the United States. Approximately at 7:15 p.m., Agent Villarreal initiated an inspection on an ambulance at the checkpoint. One of the passengers who was riding in [the ambulance] with an EMS patient was identified as Jose Paz Medina-Cantu. He admitted to agents that he did not have documentation to be in the United States legally. The ambulance was referred to secondary inspection where ambulance personnel notified agents that a pistol was found in the ambulance under a pink blanket where Medina-Cantu was sitting.

On July 11th of 2022, ATF Special Agents Guardado and Painter conducted a phone interview in Spanish of one of the ambulance employees from the June 20, 2022 incident, E.E.[] She told agents that when arriving at the checkpoint, she observed Medina-Cantu grab a small blanket, place it over his chest area, then place the blanket between himself and his wife. E.E. notified her partner, and Border Patrol agents recovered a firearm wrapped in a blanket.

ATF special agents conducted an interview of ambulance driver G.H., who told agents that during the checkpoint inspection he felt a firearm in a pink blanket and notified Border Patrol agents. He also told agents that prior to every call, they disinfect and clean the entire unit and would have noticed if someone left a firearm [i]n the ambulance.

On June 29th of 2022, ATF Special Agent David Morris researched the firearm and ammunition located in the ambulance on June 20th. He identified the firearm as a Taurus SA pistol, model PT58 HC Plus, serial number KD067572. He also inspected the ammunition and he determined that both the firearm and ammunition traveled in and affected interstate and/or foreign commerce. The firearm was manufactured in Brazil and imported in the state of Florida.

16 rounds of 38-caliber ammunition that was located was manufactured in Winchester in the state of Illinois, and three rounds of 38-caliber ammunition stamped GFL 38 auto was manufactured in the country of Italy. He also determined that the firearm was a firearm as defined in Title 18, United States Code, Chapter 44, Section 921(e)(3).

Special Agent Kenner reviewed a record of sworn statement where Medina-Cantu admits to being illegally present in the United

States. The defendant is a citizen and national of Mexico who was ordered removed on September 14th of 2007 and physically removed on September 14th of 2007. He was most recently removed on November 24th of 2020, and there's no evidence that he requested or received permission from appropriate authorities to re-enter the United States.

ROA.138-140. Mr. Medina-Cantu agreed that those facts were what happened in his case and were true and correct. ROA.142.

On May 24, 2023, the district court sentenced Mr. Medina-Cantu to 15 months in the custody of the Bureau of Prisons on Count One and a concurrent term of seven months in custody on Count Two, for a total of 15 months, to be followed by a two-year term of supervised release on Count One only. ROA.160-164. The court granted the government's motion to remit the $100 special assessment per count and did not impose a fine. ROA.160-161. Mr. Medina-Cantu timely appealed. *See* ROA.68, 92. On appeal, he raises two issues: (1) whether § 922(g)(5)(A) violates the Second Amendment and (2) the foreclosed issue of whether § 922(g)(5)(A) violates the Commerce Clause.

## SUMMARY OF THE ARGUMENT

Mr. Medina-Cantu's conviction for possession of a firearm while an alien unlawfully present in the United States should be vacated because the statute of conviction unconstitutionally infringes on his rights under the Second Amendment. As this Court has already recognized, the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), fundamentally changed the Second Amendment analysis and rendered the Fifth Circuit's prior precedent obsolete. Under the new *Bruen* framework, the government bears the burden to show that aliens unlawfully present in the United States were historically stripped of their Second Amendment rights and a broad tradition of disarmament based on that status. Because the government cannot meet that burden, 18 U.S.C. § 922(g)(5)(A) is unconstitutional, and the Court should vacate Mr. Medina-Cantu's conviction for violating that statute.

Mr. Medina-Cantu also preserves for further review by the Supreme Court his argument, foreclosed by circuit precedent, that § 922(g)(5)(A) is unconstitutional as applied to him because it allowed a conviction based only on the manufacture of the firearm and ammunition outside of, and its subsequent importation to, the state in which they were possessed, without regard to any involvement by him in such transportation or in the economic activity associated with the purchase or sale of the firearm and ammunition.

6

# ARGUMENT

**ISSUE ONE RESTATED**: 18 U.S.C. § 922(g)(5)(A) violates the Second Amendment.

## A.    Standard of review.

The Court reviews *de novo* preserved questions of a statute's constitutionality. *United States v. Daniels*, 77 F.4th 337, 341 (5th Cir. 2023) (citing *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003)).

## B.    *Bruen* abrogated this Court's Second Amendment precedent, including *Portillo-Munoz.*

In *United States v. Portillo-Munoz*, this Court held that § 922(g)(5)(A) was constitutional under the Second Amendment. 643 F.3d 437, 442 (5th Cir. 2011), *as revised* (June 29, 2011). However, that decision predates the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which this Court has held is an intervening Supreme Court decision that overruled this Court's Second Amendment precedent. *United States v. Rahimi*, 61 F.4th 443, 450 (5th Cir. 2023), *cert. granted* (U.S. June 30, 2023) (No. 22-915).[1] The Court, therefore, must consider whether § 922(g)(5)(A) passes constitutional muster under *Bruen*.

The Second Amendment to the United States Constitution mandates that a

---

[1] Although in *Rahimi* the Supreme Court has granted the government's petition for a writ of certiorari, "this [C]ourt must continue to follow its own precedent even when the Supreme Court grants certiorari on an issue." *United States v. Snow*, 309 F.3d 294, 295 (5th Cir. 2002).

"well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment codified an individual right to possess and carry weapons, the core purpose of which is self-defense in the home. 554 U.S. 570, 628 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (holding "that individual self-defense is the central component of the Second Amendment right").

After *Heller*, the Fifth Circuit "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016).  In the first step, courts would ask "whether the conduct at issue falls within the scope of the Second Amendment right." *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020) (quoting *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012)). This involved determining "whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* at 754. If the conduct was outside the scope of the Second Amendment, then the law was constitutional. *Id.* Otherwise, courts proceeded to the second step to determine whether to apply strict or intermediate scrutiny. *Id*. That framework has now been repudiated by the Supreme Court.  *See Bruen*, 142 S. Ct. at 2127; *see also Rahimi*, 61 F.4th at 450-51.

In *Bruen*, the Supreme Court announced a new framework for analyzing

Second Amendment claims, abrogating the two-step inquiry adopted by the Fifth Circuit and others. The Court rejected the second step of that framework because "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *See Bruen*, 142 S. Ct. at 2127. The Court reasoned that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*.

In *Rahimi*, this Court acknowledged that the "rule of orderliness" typically bars one panel from overturning another panel's prior decision. *Rahimi*, 61 F.4th at 450 (citing *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021)). But an intervening change in the law, such as a Supreme Court decision, overcomes that bar. *Id.* To qualify as an intervening change, a Supreme Court decision "need not expressly overrule [the Court's] precedent." *Id.* "Rather, a latter panel must simply determine that a former panel's decision has fallen unequivocally out of step with some intervening change in the law" by, for example, "fundamentally chang[ing] the focus of the relevant analysis." *Id.* (quoting *Bonvillian Marine*, 19 F.4th at 792).

The Court in *Rahimi* held that *Bruen* qualified as an intervening change. Specifically, the Court in *Rahimi* held that *Bruen* "'fundamentally change[d]' [the] analysis of laws that implicate the Second Amendment" and thus rendered the

Court's "prior precedent obsolete." *Rahimi*, 61 F.4th at 450-51 (quoting *Bonvillian Marine*, 19 F.4th at 792). Although *Rahimi* involved a different subsection of § 922(g), its holding about *Bruen*'s impact on the Court's precedent applies with equal force to § 922(g)(5)(A). Now under *Bruen*, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Rahimi*, 61 F.4th at 450 (quoting *Bruen*, 142 S. Ct. at 2129-30). "In that context, the Government bears the burden of 'justify[ing] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2130). "Put another way, 'the [G]overnment must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *Id.* (quoting *Bruen*, at 2127).

After holding that *Bruen* abrogated the Fifth Circuit's prior Second Amendment precedent, the Court in *Rahimi* went on to reject the government's interpretation of the phrases "law-abiding, responsible citizens" in *Heller* and "ordinary, law-abiding citizens" in *Bruen* as restricting the Second Amendment's applicability. *Rahimi*, 61 F.4th at 451-52. The government had argued that the fact that Rahimi was subject to a civil domestic violence restraining order meant that he was neither responsible nor law-abiding and thus "[fell] outside the ambit of the Second Amendment." *Id.* at 451. The Court disagreed, explaining that "*Heller*'s

reference to 'law-abiding, responsible' citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders 'presumptively' tolerated or would have tolerated." *Rahimi*, 61 F.4th at 452.

*Portillo-Munoz* did not engage in the proper historical analysis that *Bruen* now requires. Instead, it primarily relied on the language in *Heller* about "law-abiding citizens" and the Second Amendment belonging to "all Americans" as "invalidat[ing] [the defendant's] attempt to extend the protections of the Second Amendment to illegal aliens." *Portillo-Munoz*, 643 F.3d at 440. It also considered caselaw holding that treating illegally present aliens differently from citizens or lawfully present aliens did not violate the right to equal protection or to due process. *Id.* at 440-42. Absent from the opinion is any mention of the historical record. However, the appropriate inquiry after *Bruen*, as interpreted by *Rahimi*, is whether the government has met its burden to show that unlawfully present aliens were historically stripped from possessing firearms such that the Founders would have tolerated such a restriction. It did not meet that burden, as will be explained below.[2]

The new *Bruen* framework also requires the government to establish a broad

---

[2] Although the Eighth Circuit has held that *Bruen* did not abrogate its § 922(g)(5)(A) precedent, *United States v. Sitladeen*, 64 F.4th 978, 983-87 (8th Cir. 2023), that out-of-circuit case is, of course, not binding on this Court. Nor is it persuasive, especially in light of *Rahimi*'s interpretation of *Bruen* and rejection of the government's argument about "law-abiding, responsible citizens." *Bruen*'s focus on history cannot be squared with *Portillo-Munoz*'s analysis.

tradition of firearms restrictions like the challenged law. *See Rahimi*, 61 F.4th at 453-54. The government must identify historical precursors that are either "distinctly similar" or "relevantly similar" to the challenged law, depending on whether the law "addresses a general societal problem that has persisted since the 18th century" or "unprecedented societal concerns of dramatic technological changes," respectively. *Bruen*, 142 S. Ct. at 2131-32. And, the government must point to historical evidence demonstrating that "a governmental practice has been open, widespread, and unchallenged since the early days of the Republic." *Id*. at 2137 (cleaned up). The government cannot meet its burden under *Bruen* because there is no historical tradition, particularly from the founding era, of disarmament tied to the status of being an unlawfully present alien.

**C.    The historical record shows that unlawfully present aliens were not a group that was historically stripped of their Second Amendment rights, and there is no historical tradition, particularly from the founding era, of disarmament based on that status.**

In *Bruen*, the Supreme Court provided guidance for evaluating the historical record: "[W]hen it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35). "The Second Amendment was adopted in 1791 . . . . Historical evidence that long predates [1791] may not illuminate the scope of the right if

linguistic or legal conventions change in the intervening years." *Id.*[3] Similarly, the Court explained that "we must also guard against giving post[-]enactment history more weight than it can rightly bear." *Id.* The Court expressed skepticism about reliance on laws passed long after the passage of the particular Constitutional Amendment and explained, "to the extent later history contradicts what the text says, the text controls." *Id.* at 2137. Moreover, it is incumbent on the government, not the Court, to provide the relevant historical evidence. *See id.* at 2130 n.6, 2150.

The government cannot meet its burden under *Bruen* because there is no historical tradition, particularly from the founding era, of disarming all aliens illegally present in the United States. To the contrary, historian Patrick J. Charles, author of numerous books and articles on the Second Amendment's history and current Research Division supervisor for the Air Force Historical Research Agency, has explained that "[f]irearms regulations based on alienage did not become prevalent (and certainly were not widespread) in the statute and ordinance books until the early to mid-twentieth century." Patrick J. Charles, *The Fugazi Second Amendment:* Bruen's *Text, History, and Tradition Problem and How to Fix It*, 71

---

[3] The Fourteenth Amendment was implicated in *Bruen* because the Fourteenth Amendment imposes the Second Amendment's pronouncement on a state regulation or law. The Supreme Court did not hold for a challenge to a *federal* statute that regulations from around the passage of the Fourteenth Amendment, or 1868, would carry the same weight as those from around ratification of the Second Amendment, or 1791. *See Bruen*, 142 S. Ct. at 2137-38; *see also id.* at 2163 (Barrett, J., concurring). Indeed, *Bruen* acknowledged that 19th century evidence was secondary to that from the Nation's founding, *see id.* at 2137, and its value is likely even more limited when addressing a federal statute.

Clev. St. L. Rev. 623, 682 (2023), https://engagedscholarship.csuohio.edu/ cgi/viewcontent.cgi?article=4216&context=clevstlrev. [4] The criminal offenses of misdemeanor unlawful entry and felony illegal reentry did not exist until 1929. *See United States v. Barcenas-Rumualdo*, 53 F.4th 859, 862 (5th Cir. 2022); Eric S. Fish, *Race, History, and Immigration Crimes*, 107 Iowa L. Rev. 1051, 1053-54, 1056, 1080-89 (2022). And "the first prevalent firearms restrictions based on alienage were part of the Capper Bill and later the Uniform Firearms Act," Charles, 71 Clev. St. L. Rev. at 718 n.388, which were model laws presented to state lawmakers from 1922 to 1930, with "fewer than half the states" enacting "some version of either the [Uniform Firearms Act] or the Capper Bill" by the mid-20th century, Br. of *Amicus Curiae* Patrick J. Charles In Support of Neither Party at 14-16. Possession of a firearm by an illegally present alien did not become a federal crime until 1968. *See United States v. Orellana*, 405 F.3d 360, 367-68 (5th Cir. 2005).

Laws enacted in the 20th century are much too late under the *Bruen* historical analysis. *See Bruen*, 142 S. Ct. at 2154 & n.28 (criticizing "respondents' reliance on late-19th-century laws" due to "their temporal distance from the founding" and

---

[4] In *Bruen*, Charles filed an *amicus* brief in support of neither party, and the statement of interest noted that he is the "author of three books and more than twenty articles on the history of the Second Amendment, firearms and weapons laws, and the use of history as a jurisprudential tool. *Amicus curiae*'s scholarship has been cited and relied upon by six Circuit Courts of Appeals and by [the Supreme Court] in *McDonald*." Br. of *Amicus Curiae* Patrick J. Charles In Support of Neither Party at 1, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, S. Ct. No. 20-843 (July 19, 2021).

explaining in a footnote that the Court would "not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*"). From the absence of a historical record of disarmament based on alienage, Charles concluded that, under the analysis required by *Bruen*, "all firearms regulations based on alienage must be nullified and ruled unconstitutional." Charles, 71 Clev. St. L. Rev. at 682.

In the district court, the government admitted that "laws explicitly barring undocumented immigrants from firearm possession are of more recent vintage." ROA.51. The government attempted to overcome that admission by pointing to historical precursors either not related to firearm possession or not based on a person's status as an unlawfully present alien. ROA.60-62. That effort fell far short of the government's burden under *Bruen*.

First, the government observed that, "[w]hile 'alien men . . . could speak, print, worship, enter into contracts, hold personal property in their own name, sue and be sued, and exercise sundry other civil rights," they "typically could not vote, hold public office, or serve on juries." ROA.60 (quoting *United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J, concurring in the judgment), *cert. denied*, 142 S. Ct. 1133 (2022), which was quoting Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998)). This argument, however, is inconsistent with *Bruen* and the Second Amendment. The comparison misunderstands that civic or collective rights like voting are fundamentally distinguishable from individual

rights like the Second Amendment, as then-Judge Barrett explained in a dissent while sitting on the Seventh Circuit. *See Kanter v. Barr*, 919 F.3d 437, 462-64 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 142 S. Ct. 2111 (2022); *see also Heller*, 554 U.S. at 579-80 (distinguishing between individual and collective rights). It also ignores that *Bruen* requires the government to show consistency with the "historical tradition of *firearm regulation*." *See Bruen*, 142 S. Ct. at 2130 (emphasis added). *Bruen*'s comparison of historical analogues turns on how and why the regulations burden the *right to armed self-defense*. *See id*. at 2133. This analysis cannot be applied to historical restrictions on voting or other rights because they simply do not burden the Second Amendment right.

Second, the government in district court pointed to laws enacted by colonial governments during the American Revolution that "disarmed persons who refused to 'swear an oath of allegiance to the state or the United States.'" ROA.61 (citing Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004)). The government overlooks the significance of the fact that these disarmament laws based on loyalty oaths were enacted "[t]o deal with the potential threat coming from armed ***citizens*** who remained loyal to Great Britain." Cornell & DeDino, 73 Fordham L. Rev. at 506 (emphasis added). These laws by their very terms, therefore, were not based on alienage but rather on loyalty to Great Britain during the American Revolution.

Moreover, the history of immigration law and policy around the time of the founding shows that the distinction between legally and illegally present was not in place at that time. The Declaration of Independence itself identifies restrictions on migrants and immigration to the colonies as a key grievance, including as one of the King of Great Britain's "history of repeated injuries and usurpations" the fact that "[h]e has endeavoured to prevent the population of these States; for that purpose obstructing the Laws for Naturalization of Foreigners; refusing to pass others to encourage their migrations hither, and raising the conditions of new Appropriations of Lands." *The Declaration of Independence* (U.S. 1776). In the decades following the ratification of the Constitution, "immigration to the United States was generally free and unrestricted." Erika Lee, *At America's Gates* 2 (2003). It was not until the Chinese Exclusion Act of 1882, ch. 126, 22 Stat. 58, that the United States "stopped being a nation of immigrants that welcomed foreigners without restrictions, borders, or gates." Lee at 6. "For the first time in its history, the United States began to exert federal control over immigrants at its gates and within its borders, thereby setting standards, by race, class, and gender, for who was to be welcomed into the country." *Id.* In fact, today's "mechanisms used to regulate immigration, enforce national borders, and distinguish U.S. citizens, legal immigrants, and illegal immigrants, such as the U.S. Immigration and Naturalization Service, U.S. passports, 'green cards,' and illegal immigration and deportation policies, can all be traced back to the

Chinese exclusion era." *Id.* at 10.

Third and finally, the government's response in district court relied on the fact that, "during the ratification debates, the New Hampshire ratification convention proposed an amendment stating that 'Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion,' while delegates urged the Massachusetts convention to propose a similar amendment guaranteeing 'peaceable citizens' the right to keep arms." ROA.61 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 681, 761 (1971)). But this language was *not* included in the Second Amendment itself, and only New Hampshire's "even carried a majority of its convention." *See Kanter*, 919 F.3d at 454-55 (Barrett, J., dissenting). This Court rejected a similar argument proffered by the government in *Rahimi*, offering as a historical analogue proposals at various state ratification conventions which were not adopted ultimately in the text of the Second Amendment. *See Rahimi*, 61 F.4th at 457 (stating that proposals of various founding fathers, ultimately not adopted, "might somewhat illuminate the scope of firearms rights at the time of ratification, but they cannot counter the Second Amendment text, or serve as an analogue for § 922(g)(8) because, *inter alia*, they were not enacted"). Likewise, the government's reliance on six state constitutions in the early republic that restricted the right to keep and bear arms to citizens, ROA.61, does not account for the fact that the Second Amendment to the U.S. Constitution does not use the word "citizen."

Because the government has not met its burden under *Bruen* to provide historical evidence distinctly or relevantly similar to § 922(g)(5)(A) that would illustrate a tradition of categorically disarming aliens unlawfully present in the United States, the statute is unconstitutional. Consequently, this Court should vacate Mr. Medina-Cantu's conviction for violating § 922(g)(5)(A).

**ISSUE TWO RESTATED**:     18 U.S.C. § 922(g)(5)(A) is unconstitutional as applied to Mr. Medina-Cantu because it allowed a conviction based only on the firearm and ammunition's manufacture outside of, and subsequent importation to, the state in which they were possessed, without regard to any involvement by Mr. Medina-Cantu in such transportation or in the economic activity associated with the purchase or sale of the firearm and ammunition. (Foreclosed issue.)

## A.    Standard of review.

This Court reviews *de novo* preserved challenges to a statute as exceeding Congress's authority under the Commerce Clause. *United States v. Johnson*, 632 F.3d 912, 917 (5th Cir. 2011). Mr. Medina-Cantu acknowledges that this issue is foreclosed. *See United States v. Seekins*, No. 21-10556, 2022 WL 3644185, at *2 (5th Cir. Aug. 24, 2022) (unpublished) (summarizing precedent).  He raises it here for possible further review by the Supreme Court.

## B.    18 U.S.C. § 922(g)(5)(A) is unconstitutional as applied to Mr. Medina-Cantu, as it allowed a conviction based only on the firearm and ammunition's manufacture outside of, and its subsequent importation to, the state in which they were possessed.

Article I, § 8 of the United States Constitution provides:  "Congress shall have power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes . . . ." In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court established the test for the scope of Congress's power to regulate activities that "affect" interstate commerce: "We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Lopez*, 514 U.S.

at 559. *Lopez* seemed to, but did not expressly, overrule the more permissive test for federal regulation of gun possession articulated in *Scarborough v. United States*, 431 U.S. 563 (1977), which required only the "minimal nexus that the firearm have been, at some time, in interstate commerce." *Id.* at 575. A fair reading of *Scarborough* suggests that the case was concerned solely with statutory interpretation and did not purport to resolve any constitutional issues. *See United States v. Seekins*, 52 F.4th 988, 991 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing *en banc*).

This Court has adhered to the view that *Scarborough*'s "minimal nexus" is sufficient both to prove guilt under 18 U.S.C. § 922 and to bring any subsequent act of firearm possession within Congress's power to regulate. *United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013).

Members of the Supreme Court and judges on lower courts have acknowledged the irreconcilability of *Lopez* and a constitutional reading of *Scarborough*. *See Alderman v. United States*, 131 S. Ct. 700, 702 (2011) (Thomas, J., dissenting from denial of certiorari) ("*Scarborough*, as the lower courts have read it, cannot be reconciled with *Lopez*."); *see also United States v. Hill*, 927 F.3d 188, 215 n.10 (4th Cir. 2019) (Agee, J., dissenting) ("While some tension exists between *Scarborough* and the Supreme Court's decision in *Lopez*, the Supreme Court has not granted certiorari on a case that would provide further guidance."); *United States v. Kuban*, 94 F.3d 971, 977 (5th Cir. 1996) (DeMoss, J., dissenting) ("[T]he precise holding in *Scarborough* is

in fundamental and irreconcilable conflict with the rationale of" *Lopez*.).

Judge Ho's opinion dissenting from denial of rehearing *en banc* in *Seekins* is the most recent and thorough objection to the established view. 52 F.4th at 980-92. "In the *en banc* poll, seven judges voted in favor of rehearing" "and nine voted against rehearing." *Seekins*, 52 F.4th at 988.

If *Scarborough* is a constitutional decision, then it grants the federal government unlimited power to regulate. *See Alderman*, 131 S. Ct. at 702-03 (Thomas, J., dissenting from denial of certiorari) ("The lower courts' reading of *Scarborough*, by trumping the *Lopez* framework, could very well remove any limit on the commerce power."). Any physical object has almost certainly crossed a state line at some point in the past. To hold that this past travel grants Congress a perpetual right to regulate what someone does or does not do with that object is to eliminate any restrictions on Congress's power. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 557 (2012) (Roberts, J.) ("The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions.") (hereinafter "*NFIB*").

This unlimited power renders 18 U.S.C. § 922 unconstitutional as applied to someone like Mr. Medina-Cantu. In *NFIB*, Chief Justice Roberts noted that "[a]s expansive as our cases construing the scope of the commerce power have been, they all have one thing in common: They uniformly describe the power as reaching

'*activity*.'" *Id.* at 551 (emphasis added). He reasoned that this limitation of Commerce Clause power to "activities" is a "distinction between doing something and doing nothing [which] would not have been lost on the Framers, who were 'practical statesmen,' not metaphysical philosophers." *Id.* at 555. Four other Justices echoed Chief Justice Roberts' sentiment regarding the Commerce Clause analysis, stating that Congress could only regulate "activity affecting commerce." *NFIB*, 567 U.S. at 658 (Scalia, J., Kennedy, J., Thomas, J., Alito, J., dissenting).

Here, 18 U.S.C. § 922 did not require that Mr. Medina-Cantu's possession of the gun was an economic activity; this ought to be fatal to the conviction. As explained by *NFIB*, the Commerce Clause permits Congress to regulate only activities, *i.e.*, the active participation in a market. But § 922(g) criminalizes all possession, without reference to economic activity. Accordingly, it sweeps too broadly.

Further, the statute did not require that Mr. Medina-Cantu be engaged in the relevant market at the time of the regulated conduct. Chief Justice Roberts also noted that Congress cannot regulate a person's activity under the Commerce Clause unless the person affected is "currently engaged" in the relevant market. *NFIB*, 567 U.S. at 556-57 (Roberts, C.J.) (concurring). As an illustration, the Chief Justice provided the following example: "An individual who bought a car two years ago and may buy another in the future is not 'active in the car market' in any pertinent sense." *Id.* As

such, *NFIB* overrules the long-standing notion that a firearm which has previously and remotely passed through interstate commerce should be considered to affect commerce indefinitely without "concern for when the [initial] nexus with commerce occurred." *Scarborough*, 431 U.S. at 577.

Mr. Medina-Cantu's case illustrates how this Court's precedent removes any limitation on Congress's commerce power. Here, the sole facts cited in the factual basis for the guilty plea was that the firearm "was manufactured in Brazil and imported in the state of Florida," certain rounds of the ammunition were manufactured in Illinois, and other rounds were manufactured in Italy. ROA.139. The prosecutor offered no proof that Mr. Medina-Cantu had traveled in interstate commerce to bring the firearm or ammunition to Texas, nor even proof that Mr. Medina-Cantu had purchased the firearm or ammunition from any vendor participating in interstate commerce.

Accordingly, Mr. Medina-Cantu was convicted under this statute without evidence that he was "currently engaged" in the gun or ammunition market at the time of his arrest, and without evidence showing how recently he came to possess the gun and ammunition. So § 922(g)(5)(A) fails to survive *NFIB*'s Commerce Clause analysis. The statute has been construed to require only that a firearm have traveled in interstate commerce at some previous time. *See Scarborough*, 431 U.S. at 575. If it cannot be construed to require commercial activity of some kind by the

defendant—something more substantial than mere possession of an item that may have crossed state lines years ago—it then contains no jurisdictional element sufficient to bring it within the terms of Congressional power.  In the absence of such a jurisdictional element, the Supreme Court has found federal criminal statutes falling substantially outside the Commerce power to be unconstitutional, without pausing to consider whether the particular conduct of the defendant might have affected commerce. *See Lopez*, 514 U.S. at 561; *United States v. Morrison*, 529 U.S. 598, 607 (2000). In other words, without such an element, comparable statutes have been found unconstitutional. Mr. Medina-Cantu concedes that this argument was rejected in *Alcantar*, 733 F.3d at 145-46, among other cases, but raises it to preserve the issue for possible further review.

## CONCLUSION

In light of the Supreme Court's decision in *Bruen*, § 922(g)(5)(A) is unconstitutional, and this Court should vacate Mr. Medina-Cantu's conviction under that statue. Alternatively, although the argument is foreclosed and is presented here to preserve the issue for further appeal, this Court should hold that the statute of conviction is unconstitutional as applied to Mr. Medina-Cantu because it allowed a conviction based only on the firearm and ammunition's manufacture outside of, and subsequent importation to, the state in which they were possessed, without regard to any involvement by Mr. Medina-Cantu in such transportation or in the economic activity associated with the purchase or sale of the firearm and ammunition.

Respectfully submitted,

MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas

s/ Kathryn Shephard
KATHRYN SHEPHARD
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002-1056
Telephone: (713) 718-4600

## CERTIFICATE OF SERVICE

All parties required to be served with copies of this document have been so served by filing via the Fifth Circuit ECF filing system.

s/ Kathryn Shephard
KATHRYN SHEPHARD

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,775 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 (current version) software in Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes.

3.  This brief complies with the privacy redaction requirement of 5th Cir. R. 25.2.13 because the brief has been redacted of any personal data identifiers.

4.  This brief complies with the electronic submission of 5th Cir. R. 25.2.1 because this brief is an exact copy of the paper document.

5.  This brief is free of viruses because the brief has been scanned for viruses with the most recent version of a commercial virus scanning program.

s/ Kathryn Shephard
KATHRYN SHEPHARD