No. 23-40336

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
                              Plaintiff-Appellee,

v.

JOSE PAZ MEDINA-CANTU,
                              Defendant-Appellant.

On Appeal from the United States District Court
for the Southern District of Texas
Corpus Christi Division, Case No. 2:22-CR-426-1

BRIEF OF PLAINTIFF-APPELLEE

ALAMDAR S. HAMDANI
United States Attorney

CARMEN CASTILLO MITCHELL
Chief, Appellate Division

EILEEN K. WILSON
Assistant United States Attorney

United States Attorney's Office
1000 Louisiana, Suite 2300
Houston, Texas 77002

ATTORNEYS FOR APPELLEE

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument will not significantly aid the decisional process. *See* FED. R. APP. P. 34(a)(2)(c). This Court's precedent forecloses relief on Defendant-Appellant Jose Paz Medina-Cantu's claim challenging the constitutionality of 18 U.S.C. § 922(g)(5). The facts and legal arguments are adequately presented in the briefs and record.

# TABLE OF CONTENTS

**PAGE**

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF AUTHORITIES ....................................................v

STATEMENT OF JURISDICTION ........................................1

STATEMENT OF THE ISSUES .............................................1

STATEMENT OF THE CASE ...............................................2

    I.    MEDINA-CANTU'S *BRUEN*-BASED MOTION TO DISMISS .............2

    II.   MEDINA-CANTU'S CONDITIONAL GUILTY PLEA..........................3

    III.  THE PSR AND SENTENCING .....................................6

SUMMARY OF ARGUMENT ...................................................7

ARGUMENT .....................................................................8

    BRUEN DID NOT ABROGATE THIS COURT'S PRIOR HOLDING THAT 18 U.S.C. § 922(G)(5)(A) IS CONSTITUTIONAL UNDER THE SECOND AMENDMENT (ISSUE ONE) ...................................8

    I.    *DE NOVO* REVIEW APPLIES .......................................8

    II.   THE SECOND AMENDMENT RIGHT TO KEEP AND BEAR ARMS IS NOT UNLIMITED ...........................................9

    III.  SECTION 922(G)(5) IS A LAWFUL REGULATORY MEASURE .........9

        A.    AFTER *HELLER*, THIS COURT REJECTED A SECOND AMENDMENT CHALLENGE TO 18 U.S.C. § 922(G)(5) ......10

        B.    THE EIGHTH CIRCUIT EMBRACED THIS COURT'S DECISION IN *PORTILLO-MUNOZ* .................................12

ii

# TABLE OF CONTENTS, cont'd

**PAGE**

IV.   THE SUPREME COURT'S DECISION IN *BRUEN* DID NOT ABROGATE *HELLER* ............................................................... 13

V.   AFTER *BRUEN*, § 922(G)(5)'S PROHIBITION ON THE POSSESSION OF FIREARMS OR AMMUNITION BY UNLAWFULLY PRESENT NONCITIZENS REMAINS CONSTITUTIONAL .................................................................... 16

    A.   THIS COURT'S PRIOR DECISION IN *PORTILLO-MUNOZ* REMAINS GOOD LAW AFTER *BRUEN* ............................... 16

    B.   THE EIGHTH CIRCUIT UPHELD § 922(G)(5)(A) AFTER *BRUEN* ......................................................................... 17

    C.   THIS COURT'S DECISION IN *UNITED STATES V. RAHIMI* IS DISTINGUISHABLE ........................................ 19

VI.   ASSUMING MEDINA-CANTU AND OTHER ILLEGAL ALIENS ARE ENTITLED TO SOME MEASURE OF PROTECTION UNDER THE SECOND AMENDMENT, § 922(G)(5)(A) IS CONSISTENT WITH AND SIMILAR TO THE RELEVANT HISTORICAL PRACTICE OF FIREARMS REGULATION ................. 22

    A.   SECTION 922(G)(5)(A) IS CONSISTENT WITH THE RELEVANT HISTORICAL PRACTICE AROUND FIREARMS REGULATION ................................................ 24

    B.   SECTION 922(G)(5)(A) IS SUFFICIENTLY ANALOGOUS TO HISTORIC EXCLUSIONS TO FIREARMS POSSESSION ...................................................................... 29

AS MEDINA-CANTU CONCEDES, HIS CLAIM IS FORECLOSED THAT 18 U.S.C. § 922(G)(5)(A) IS UNCONSTITUTIONAL AS APPLIED TO HIM BECAUSE HE COULD BE CONVICTED BASED ONLY ON THE FIREARM AND AMMUNITION'S MANUFACTURE IN ANOTHER STATE (ISSUE TWO) ........................................................................ 33

# **TABLE OF CONTENTS, cont'd**

**PAGE**

I.    *De Novo* Review Applies ......................................................33

II.    As He Concedes, Medina-Cantu's Complaint Is
       Foreclosed...........................................................................33

CONCLUSION .........................................................................35

CERTIFICATE OF COMPLIANCE........................................36

CERTIFICATE OF SERVICE.................................................37

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGE(S)**

*District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)............... *passim*

*McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) ............... 9, 12, 27

*Bayard v. Singleton*, 1 N.C. 5 (1787) ..................................................... 26

*Dawson's Lessee v. Godfrey*, 8 U.S. (4 Cranch) 321,
    2 L. Ed. 634 (1808) ........................................................................ 26

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021) .................... 32

*In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787 (5th Cir. 2021).......... 21

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022) .................................................................. *passim*

*Scarborough v. United States*, 431 U.S. 563 (1977)............................... 33

*United States v. Alcantar*, 733 F.3d 143 (5th Cir. 2013) ....................... 34

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012) ............ 13, 26

*United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011) .............. 12, 13, 17

*United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012)......... 13

*United States v. Jimenez-Shilon*, 34 F.4th 1042
    (11th Cir. 2022) ................................................................. 13, 25, 28

*United States v. Lopez*, 514 U.S. 549 (1995) .......................................... 34

*United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015) ........... 13

## <u>TABLE OF AUTHORITIES, cont'd</u>

<u>CASES</u>                                                    <u>PAGE(S)</u>

*United States v. Munoz-De La O*, 586 F. Supp. 3d 1032
 (E.D. Wash. 2022)............................................................30

*United States v. Penn*, 969 F.3d 450 (5th Cir. 2020) ................................8

*United States v. Perez*, 6 F.4th 448 (2d Cir. 2021), *cert. denied*,
 142 S. Ct. 1133 (2022) ................................................ 13, 24, 27, 28

*United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011) ...... *passim*

*United States v. Rahimi*, 61 F.4th 443 (5th Cir.), *cert. granted*,
 143 S. Ct. 2688 (2023) ............................................................ 19, 20

*United States v. Rahimi*, 143 S. Ct. 2688 (2023) ....................................21

*United States v. Shah*, 84 F.4th 190 (5th Cir. 2023) ..............................33

*United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023) .............. *passim*

*United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019) ..........................13

## <u>RULES AND STATUTES</u>

F<small>ED</small>. R. A<small>PP</small>. P. 4(b)(1)(A)(i) ........................................................1

F<small>ED</small>. R. A<small>PP</small>. P. 34(a)(2)(c)........................................................i

18 U.S.C. § 922(g)(1)...............................................................33

18 U.S.C. § 922(g)(5).............................................................i, 10

18 U.S.C. § 922(g)(5)(A)..................................................... *passim*

18 U.S.C. § 922(g)(8)...............................................................19

# TABLE OF AUTHORITIES, cont'd

## RULES AND STATUTES                                    PAGE(S)

18 U.S.C. § 1326(a) ................................................................. 2

18 U.S.C. § 3231 ..................................................................... 1

28 U.S.C. § 1291 ..................................................................... 1

## UNITED STATES SENTENCING GUIDELINES

U.S.S.G. § 2K2.1 ..................................................................... 6

U.S.S.G. § 2K2.1 & n.3 ............................................................ 6

U.S.S.G. § 2K2.1(a)(6) ............................................................ 6

U.S.S.G. § 3D1.4 ..................................................................... 6

U.S.S.G. § 3E1.1(a) ................................................................. 6

## CONSTITUTION

U.S. CONST. amend. II .............................................................. 9

## OTHER AUTHORITIES

1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689) ...................... 25

1 William Blackstone, *Commentaries on the Laws of England* *372 (1765) ................................................................................ 26

2 Bernard Schwartz, *The Bill of Rights: A Documentary History 681, 761* (1971) ................................................................. 27

3 J. Story, *3038 Commentaries on the Constitution of the United States* § 1890, p. 746 (1833) .......................................................... 28

# TABLE OF AUTHORITIES, cont'd

## OTHER AUTHORITIES                                    PAGE(S)

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction 48* (1998) ....................................................................... 25

Giles Jacob, *A New Law-Dictionary* (1750) (unpaginated), *reprinted in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins 300* (Neil H. Cogan ed., 2d ed. 2015) ...................... 26

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right 140* (1996) .................................................. 24

Patrick J. Charles, *Armed in America* 51, 58 (2018) ............................. 26

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 L. & Hist. Rev. 139, 157* (2007) ............... 27

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control,* 73 Fordham L. Rev. 487, 506 (2004) ...................................................................... 27

U.S. Citizenship and Immigration Services, Early American Immigration Policies, https://www.uscis.gov/about-us/our-history/overview-of-inshistory/early-american-immigration-policies (July 30, 2020) .................................................... 30

## STATEMENT OF JURISDICTION

This appeal is from a judgment entered on May 31, 2023. (ROA.86). [1] Defendant-Appellant Jose Paz Medina-Cantu ("Medina-Cantu") timely filed a notice of appeal on June 2, 2023. *See* FED. R. APP. P. 4(b)(1)(A)(i). (ROA.92). The district court (Ramos, J.) had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether 18 U.S.C. § 922(g)(5)(A), which prohibits an illegal alien from possessing a firearm or ammunition, violates the Second Amendment after the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). (Issue One Restated)

Whether 18 U.S.C. § 922(g)(5)(A) exceeds Congress's power under the Commerce Clause as applied to Medina-Cantu because it allowed a conviction based upon proof that the firearm and ammunition were manufactured in another state and without regard to any involvement by

---

[1] "ROA." refers to the appellate record stamped "23-40336" and is followed by the applicable page number(s). "D.E." means the court's docket sheet entry. "PSR" refers to the April 10, 2023 pre-sentence report.

him in the transportation or economic activity associated with their purchase or sale.  (Issue Two Restated – Foreclosed Issue)

## STATEMENT OF THE CASE

### I. MEDINA-CANTU'S *BRUEN*-BASED MOTION TO DISMISS

Medina-Cantu was indicted on two counts: (1) knowingly possessing, in and affecting foreign and/or interstate commerce, a firearm and ammunition[2] knowing that he was an illegal alien and unlawfully in the United States, in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2), and (2) illegally reentering the United States, in violation of 18 U.S.C. § 1326(a), (b).  (ROA.13-14).

Medina-Cantu moved to dismiss count one arguing that 18 U.S.C. § 922(g)(5)(A) violates the Second Amendment based on the Supreme Court's decision in *Bruen*.  (ROA.38-46).  The Government responded that the Second Amendment's plain text does not extend to the conduct described in § 922(g)(5) and that § 922(g)(5) is consistent with the historical tradition of gun regulation.  (ROA.48-63).  The district court

---

[2] Medina-Cantu had: (1) a Forjas Taurus S.A. Pistol, Model: PT58HC Plus, Caliber: .380 ACP, Serial Number: KDO67572, (2) 16 rounds of .380 caliber ammunition with headstamp "WIN 380 AUTO," and (3) three rounds of .380 caliber ammunition with headstamp "G.F.L. 380 AUTO."  (ROA.13).

denied Medina-Cantu's motion, finding "[e]ither (1) as an alien illegally present in the United States, he is disqualified or (2) if qualified, the regulation still comports with historical traditions limiting the scope of the Second Amendment." (ROA.64-75).

## II.   MEDINA-CANTU'S CONDITIONAL GUILTY PLEA

Medina-Cantu subsequently pleaded guilty to both counts in the indictment.[3]  (ROA.86-87, *see* ROA.137, 145, *see also* ROA.118-20).   In support of the plea, the prosecutor stated:

> On June 20th of 2022, Border Patrol agents at the Falfurrias Border Patrol Checkpoint received information that an ambulance would be arriving with persons illegally present in the United States. Approximately at 7:15 p.m., Agent Villarreal initiated an inspection on an ambulance at the checkpoint. One of the passengers who was riding in [sic] with an EMS patient was identified as Jose Paz Medina-Cantu. He admitted to agents that he did not have documentation to be in the United States legally. The ambulance was referred to secondary inspection where ambulance personnel notified agents that a pistol was found in the ambulance under a pink blanket where Medina-Cantu was sitting.
>
> On July 11th of 2022, ATF Special Agents Guardado and Painter conducted a phone interview in Spanish of one of the ambulance employees from the June 20, 2022 incident, E.E. She told agents that when arriving at the checkpoint, she observed Medina-Cantu grab a small blanket, place it over his chest area, then place the blanket between himself and his

---

[3] There was no plea agreement.  (ROA.185 - ¶ 4, 197 - ¶ 72).

wife. E.E. notified her partner, and Border Patrol agents recovered a firearm wrapped in a blanket.

ATF special agents conducted an interview [with] ambulance driver G.H., who told agents that during the checkpoint inspection he felt a firearm in a pink blanket and notified Border Patrol agents. He also told agents that prior to every call, they disinfect and clean the entire unit and would have noticed if someone left a firearm on the ambulance.

On June 29th of 2022, ATF Special Agent David Morris researched the firearm and ammunition located in the ambulance on June 20th. He identified the firearm as a Taurus SA pistol, model PT58 HC Plus, serial number KD067572. He also inspected the ammunition and he determined that both the firearm and ammunition traveled in and affected interstate and/or foreign commerce. The firearm was manufactured in Brazil and imported in the state of Florida.

16 rounds of 38-caliber ammunition that was located was manufactured in Winchester in the state of Illinois, and three rounds of 38-caliber ammunition stamped GFL 38 auto was manufactured in the country of Italy. He also determined that the firearm was a firearm as defined in Title 18, United States Code, Chapter 44, Section 921(e)(3).

Special Agent Kenner reviewed a record of sworn statement where Medina-Cantu admits to being illegally present in the United States. The defendant is a citizen and national of Mexico who was ordered removed on September 14th of 2007 and physically removed on September 14th of 2007. He was most recently removed on November 24th of 2020, and there's no evidence that he requested or received permission from appropriate authorities to re-enter the United States.

4

(ROA.138-40).

Before the court could accept the plea, defense counsel stated that they "admitted that Mr. Medina-Cantu committed all of the conduct just described" and that he was "guilty of the charged offense," but as set forth in the prior motion to dismiss, the Government had no power to prosecute him because the statute violated the Second Amendment. (ROA.140-41). Defense counsel recognized that the court had denied Medina-Cantu's motion to dismiss but wanted to "re-urge" and "preserve the conditional issue for further appellate review." (ROA.140).

Also, Medina-Cantu admitted that the firearm and ammunition were manufactured outside of Texas before he possessed them. (ROA.141). While recognizing the issue was foreclosed, counsel contended that Congress should not be able to reach such conduct and the facts were insufficient to establish a nexus. (*See* ROA.141).

The district court responded that it was going to deny the motion to dismiss based on its prior opinion and analysis. (ROA.141). The court added that it would deny Medina-Cantu's "request for a dismissal on the other request." (ROA.141).

Medina-Cantu then agreed that the prosecutor had recited the facts

accurately.  (ROA.142).  The court determined that there was a sufficient factual basis for the plea and accepted it.  (ROA.142, 145).

## III.  THE PSR AND SENTENCING

Medina-Cantu's total offense level was 13.  (ROA.190 - ¶ 40).  His base offense level was 14 because he violated 18 U.S.C. § 922(g)(5)(A).  (ROA.189 - ¶ 22).  *See* U.S.S.G. § 2K2.1(a)(6) (14 base offense level if defendant was a prohibited person when he committed the instant offense); *see also* U.S.S.G. § 2K2.1 & n.3 ("prohibited person" means any person described in 18 U.S.C. § 922(g)).  Medina-Cantu received an additional level for a multiple count adjustment.  (*See* ROA.189-90 - ¶¶ 34, 36-37).  *See* U.S.S.G. § 3D1.4.  Two levels were deducted for his acceptance of responsibility.  (ROA.190 - ¶ 39).  *See* U.S.S.G. § 3E1.1(a).

Medina-Cantu was placed in criminal history category II because he received two criminal history points for a prior illegal entry conviction.[4]  (ROA.192-93 - ¶¶ 47-48, ROA.201).  The guideline range for imprisonment was 15 to 21 months.  (ROA.196 - ¶ 70).  Medina-Cantu did not object to the PSR.  (*See* ROA.151-52).

---

[4] Medina-Cantu had several unscored misdemeanor convictions from 2005-2010 for driving while intoxicated and illegal entry.  (*See* ROA.190-92 - ¶¶ 42-46).

At the sentencing hearing, the district court adopted the PSR with some corrections that are not relevant here. (*See* ROA.152-55, 160, 201). The court sentenced Medina-Cantu to 15 months' imprisonment for Count 1 and seven months for Count 2, to run concurrently, for a total of 15 months, followed by two years of supervised release for Count 1. (ROA.88-89, 161, 163).

## SUMMARY OF ARGUMENT

ISSUE ONE:  The Second Amendment does not prohibit Congress from disarming Medina-Cantu and other illegal aliens. By its own terms, the Second Amendment protects a right of "the people," a term that the Supreme Court has interpreted to mean "members of the political community." Additionally, the Supreme Court has repeatedly stated that the Second Amendment allows Congress to disarm persons who are not law-abiding, responsible "citizens," a term that excludes illegally present aliens.

This Court held in *Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011), that noncitizens illegally present in the United States lack Second Amendment rights. That decision remains good law after *Bruen* and should be construed to foreclose Medina-Cantu's argument.    Even

assuming illegal aliens are part of "the people" protected by the Second Amendment, § 922(g)(5)(A) is consistent with and similar to the relevant historical practice of firearms regulation.

ISSUE TWO:    As Medina-Cantu acknowledges, this Court's precedent forecloses his argument that U.S.S.G. § 922(g)(5) is unconstitutional as applied to him because the statute allows conviction upon proof that a firearm or ammunition was manufactured outside the state.

## ARGUMENT

### *BRUEN* DID NOT ABROGATE THIS COURT'S PRIOR HOLDING THAT 18 U.S.C. § 922(g)(5)(A) IS CONSTITUTIONAL UNDER THE SECOND AMENDMENT (ISSUE ONE)

### I.  *DE NOVO* REVIEW APPLIES

Medina-Cantu argues that 18 U.S.C. § 922(g)(5)(A) is unconstitutional on its face after the Supreme Court's decision in *Bruen*. Because he preserved the right to appeal this issue, *de novo* review applies.  *See Portillo-Munoz*, 643 F.3d at 439 (applying *de novo* review to conditional guilty plea challenging 18 U.S.C. § 922(g)(5)); *see also United States v. Penn*, 969 F.3d 450, 459 (5th Cir. 2020) (applying *de novo* review

where defendant preserved 18 U.S.C. § 922(g) constitutionality argument by raising it in motion to dismiss indictment).

## II.  THE SECOND AMENDMENT RIGHT TO KEEP AND BEAR ARMS IS NOT UNLIMITED

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.  In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to possess arms for self-defense.[5]  554 U.S. 570, 635 (2008).  The Court cautioned, however, that the right to keep and bear arms "is not unlimited" and that the right remains subject to "lawful regulatory measures."  *Id.* at 626, 627 n.26.  Medina-Cantu's statute of conviction is one such lawful regulatory measure.  *See* 18 U.S.C. § 922(g)(5)(A).

## III.  SECTION 922(g)(5) IS A LAWFUL REGULATORY MEASURE

Section 922(g)(5)(A) states that "[i]t shall be unlawful for any person . . . who, being an alien . . . is illegally or unlawfully in the United States . . . to ship or transport in interstate or foreign commerce, or

---

[5] In *McDonald v. City of Chicago*, the Court held that this individual right is also a "fundamental" right incorporated against the states by the Fourteenth Amendment's Due Process Clause.  561 U.S. 742, 791 (2010).

possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." *Id*.

In the instant case, there is no dispute that Medina-Cantu's conduct violated § 922(g)(5)(A). He admitted that he was in the United States illegally and possessed a firearm and ammunition. (*See* ROA.140, 142). (Brief, p. 5). The issue is whether the statute is unconstitutional under the Second Amendment.

## A. AFTER *HELLER*, THIS COURT REJECTED A SECOND AMENDMENT CHALLENGE TO 18 U.S.C. § 922(g)(5)

In *Portillo-Munoz*, Portillo contended that § 922(g)(5)(A) violated the Second Amendment because "the people" to whom the right is guaranteed "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 643 F.3d at 440. Just like Medina-Cantu here, there was no question that Portillo's actions violated § 922(g)(5)(A). *See id*. at 439. The issue was "[w]hether the protections contained in the Second Amendment extend to aliens illegally present" in the United States. *Id*. Although several district courts had addressed the issue, no circuit court had. *Id*. This Court

determined that § 922(g)(5) is constitutional under the Second Amendment. *Id.* at 442.

This Court acknowledged *Heller*'s holding "that the Second Amendment guarantees an individual right to possess and carry weapons," but stressed that "[t]he individual laying claim to the Second Amendment's protections [in *Heller*] . . . was a United States citizen." *Id.* at 439-40. Whether an alien, illegal or legal, has a right to bear arms was not an issue in *Heller*. *Id.* at 440.

The Supreme Court also took "care to note that it was not purporting to 'clarify the entire field' of the Second Amendment." *Id.* Even so, the Court provided "some guidance as to the meaning of the term 'the people' as it is used in the Second Amendment. The Court held the Second Amendment 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Id.* Moreover, the Supreme Court "noted that 'in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset' before going on to say that '[w]e start therefore with

a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans.'" *Id.* (brackets original).

This Court concluded that the language in *Heller* invalidated Portillo's attempt to extend the protections of the Second Amendment to illegal aliens.[6] "Illegal aliens are not 'law-abiding, responsible citizens' or 'members of the political community,' and aliens who enter or remain in this country illegally and without authorization are not Americans as that word is commonly understood." *Id.* "[T]he Supreme Court has long held that Congress has the authority to make laws governing the conduct of aliens that would be unconstitutional if made to apply to citizens." *Id.* at 441.

## B.    THE EIGHTH CIRCUIT EMBRACED THIS COURT'S DECISION IN *PORTILLO-MUNOZ*

A short time later the Eighth Circuit followed this Court's lead and rejected an illegal alien's facial challenge to § 922(g)(5)(A). *See United States v. Flores*, 663 F.3d 1022, 1022-23 (8th Cir. 2011). Flores had argued that "unlawfully present aliens are part of 'the people' who have the Second Amendment right to keep and bear arms and that §

---

[6] This Court added that "nothing in *McDonald v. City of Chicago*," 561 U.S. 742, 791 (2010), "suggested otherwise." *See id.* at n.1.

922(g)(5)(A) is therefore unconstitutional." *United States v. Sitladeen*, 64 F.4th 978, 983 (8th Cir. 2023). "Agreeing with" with this Court, the Eight Circuit held "that the protections of the Second Amendment do not extend to aliens illegally present in this country." [7] *Flores,* 663 F.3d at 1023.

## IV. THE SUPREME COURT'S DECISION IN *BRUEN* DID NOT ABROGATE *HELLER*

In *Bruen*, the Supreme Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens . . . to carry a handgun for self-defense outside the home." 597 U.S. at 9-10. The Court struck down a New York law requiring residents to demonstrate a

---

[7] After *Portillo-Munoz* and *Flores*, "several . . . sister courts . . . parted ways with the reasoning" of these decisions, but none found § 925(g)(5) unconstitutional. *Sitladeen*, 64 F.4th at 984. The Second, Ninth, and Tenth Circuits assumed, without deciding, that the Second Amendment may apply to unlawfully present aliens, but that § 922(g)(5)(A) is nonetheless constitutional because it satisfies some measure of means-end scrutiny. *Id.* (citing *United States v. Perez*, 6 F.4th 448, 453 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1133 (2022); *United States v. Torres*, 911 F.3d 1253, 1257) (9th Cir. 2019); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012); *see also United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046-48 (11th Cir. 2022) ("assuming that 'the people' includes unlawfully present aliens but concluding that the right codified by the Second Amendment is a 'citizen's right'"). The Fourth Circuit found that "[i]llegal aliens do not belong to the class of law-abiding members of the political community to whom the protection of the Second Amendment is given. . . ." *Id.* (citing *United States v. Carpio-Leon*, 701 F.3d 974, 981 (4th Cir. 2012)). The Seventh Circuit was the only circuit that held "at least some unlawfully present aliens are included within 'the people' of the Second Amendment." *Id.* (citing *United States v. Meza-Rodriguez*, 798 F.3d 664, 672-73 (7th Cir. 2015) (ultimately upholding § 922(g)(5)(A) under intermediate scrutiny)).

"proper[] cause" to obtain a license to carry a handgun outside the home because that law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 17.

In reaching its decision, the Court rejected the "'two-step'" framework for analyzing Second Amendment challenges the "Courts of Appeals ha[d] coalesced around" after *Heller* and *McDonald* that "combine[d] history with means-end scrutiny." *Id.* at 17. The Court observed that step one of this test was "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 19. The Court specifically "decline[d] to adopt" the second step, which asked "how close the [challenged] law c[ame] to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.* at 17-18.

*Bruen* then clarified the "standard for applying the Second Amendment." *Id.* at 17, 24; *see also Sitladeen*, 64 F.4th at 984. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17, 24. Second, when a regulation infringes such

presumptively protected conduct, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 17. The Government may not simply posit that it promotes an important interest. *Id.* "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*; *see also id.* at 24.

The Supreme Court explained that the relevant metrics for assessing regulations' constitutionality are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The Government does not have to "point to a 'historical *twin*,' but only an analogous, i.e., 'relevantly similar,' historical regulation that imposed 'a comparable burden on the right of armed self-defense' and that was 'comparably justified.'" *Sitladeen*, 64 F.4th at 985; *see Bruen*, 597 U.S. at 30.

**V.    AFTER *BRUEN*, § 922(g)(5)'S PROHIBITION ON THE POSSESSION OF FIREARMS OR AMMUNITION BY UNLAWFULLY PRESENT NONCITIZENS REMAINS CONSTITUTIONAL**

**A.    THIS COURT'S PRIOR DECISION IN *PORTILLO-MUNOZ* REMAINS GOOD LAW AFTER *BRUEN***

*Bruen* did not address the scope of the Second Amendment as it pertains to a noncitizen who is unlawfully present in the United States. *See Sitladeen*, 64 at 984 ("*Bruen* does not address the meaning of 'the people,' much less the constitutionality of criminal firearm statutes like § 922(g)(5)(A)."). Indeed, as Justice Alito stated in his concurring opinion, *Bruen* "decide[d] nothing about *who* may lawfully possess a firearm." 597 U.S. at 72 (Alito, J., concurring) (emphasis added). He further noted that *Bruen* did not "disturb[] anything that" the Court said in *Heller* or *McDonald*. *Id*.

For these reasons, this Court's holding in *Portillo-Munoz* remains intact. This Court conducted the type of analysis *Bruen* requires in deciding that the Second Amendment's text does not protect a noncitizen who is illegally present in the United States. Unlike some other circuits, *Portillo-Munoz* did not rely on means-end scrutiny or another form of interest-balancing. *See Sitladeen*, 64 F.4th at 984 (noting that the Second, Seventh, Ninth, and Tenth Circuits had used the prohibited

16

analysis). Instead, this Court reached its "conclusion by considering—consistent with what *Bruen* now requires—whether the conduct regulated by § 922(g)(5)(A) was protected by the plain text of the Second Amendment." *Id*. This Court held such conduct was not protected, and its analysis aligns with *Bruen*'s current framework. *See id.* The Eighth Circuit recently agreed in a post-*Bruen* challenge to § 922(g)(5)(A).

## B.   THE EIGHTH CIRCUIT UPHELD § 922(g)(5)(A) AFTER *BRUEN*

In *Sitladeen*, the Eighth Circuit revisited its decision in *Flores* which had "favorably" cited and relied upon this Court's analysis in *Portillo-Munoz* to hold "that 'the protections of the Second Amendment do not extend to aliens illegally present in this country.'" *See id*. at 983; *see also Flores*, 663 F.3d at 1023. The Eighth Circuit recognized that, under *Bruen*, it first had to "ask whether § 922(g)(5)(A) governs conduct that falls within the plain text of the Second Amendment." *Sitladeen*, 64 F.4th at 985 (citing *Bruen*, 597 U.S. at 17). "Only if the answer [wa]s yes" would the court "proceed to ask whether § 922(g)(5)(A) fits within America's historical tradition of firearm regulation." *Id*. In the Eighth Circuit's "view, *Flores* already answer[ed] the first question, and its

answer is no." *Id*. The court, therefore, did not need to proceed to the second part of *Bruen*'s inquiry. *See id*.

The Eighth Circuit stated it "was unmistakable that" its "holding in *Flores* [wa]s about the plain text of the Second Amendment—about what is meant by the phrase, 'the people.'" *Id*. Unlike the Second, Seventh, Ninth, and Tenth Circuits, the Eighth Circuit had not reached its conclusion that § 922(g)(5)(A) is constitutional by engaging in means-end scrutiny or some other interest-balancing exercise. *Id*. "Rather, as the unqualified language" in *Flores* and "the citation to [this Court's decision in] *Portillo-Munoz* make clear," the Eighth Circuit had reached its "conclusion by considering—consistent with what *Bruen* now requires—whether the conduct regulated by § 922(g)(5)(A) was protected by the plain text of the Second Amendment." *Id*. The Eighth Circuit had determined "that it was not, as unlawfully present aliens are not within the class of persons to which the phrase 'the people' refers." *Id*.

The Eighth Circuit stressed that "[n]othing in *Bruen* casts doubt on . . . [on the Eighth Circuit's or this Court's] interpretation of this phrase." *Id*. (quoting *Bruen*, 597 U.S. at 31-32 that, "It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—

are part of 'the people' whom the Second Amendment protects."). "Indeed, *Bruen* 'decide[d] nothing about *who* may lawfully possess a firearm.'" *Id.* (brackets and emphasis original) (citing Justice Alito's concurrence in *Bruen*, 597 U.S. at 72).

In *Sitladeen*, the Eighth Circuit concluded it remained "bound by *Flores*." *Id.* This Court should reach the same conclusion with respect to *Portillo-Munoz*. The Eighth Circuit's and this Court's analysis comport with *Bruen* and *Heller*. *Portillo-Munoz* represents a proper application of the first part of the *Bruen* standard. *See* 643 F.3d at 439-42.

## C.    THIS COURT'S DECISION IN *UNITED STATES V. RAHIMI* IS DISTINGUISHABLE

In *Sitladeen*, the Eighth Circuit noted that some courts both before and after *Bruen* had criticized the "so-called 'scope of the right' approach, insisting that a textual analysis of 'the people' is not the right starting point when deciding whether a firearm regulation violates the Second Amendment." *See* 64 F.4th at 986. As an example, the Eighth Circuit cited this Court's decision in *United States v. Rahimi*, 61 F.4th 443, 451-53 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023) (No. 22-915). *Id.* at 986.

There, Rahimi "levie[d] a facial challenge to 18 U.S.C. § 922(g)(8)," which prohibits someone subject to a domestic violence restraining order from possessing a firearm or ammunition provided three conditions are satisfied. *See Rahimi,* 61 F.4th at 449. This Court began by reasoning that Rahimi "is included in 'the people' and thus within the Second Amendment's scope." *Id.* at 451. This Court acknowledged that the Supreme Court in *Heller* and *Bruen* referred to and described the right to keep and bear arms as belonging to "law-abiding, responsible citizens" or "ordinary, law-abiding citizens," but it then interpreted those phrases to exclude only "felons." "the mentally ill," and other "groups that have historically been stripped of their Second Amendment rights." *See id.* at 451-53. After concluding Rahimi was "hardly a model citizen," this Court said he was not a "convicted felon" or otherwise excluded from the Second Amendment's scope. *See id.* at 453.

Because Rahimi presumptively held Second Amendment rights, this Court examined the historical analogues the Government had offered but rejected each one. *See id.* at 456-61. This Court then concluded that § 922(g)(8) is unconstitutional. *Id.* at 461.

*Rahimi* does not undermine this Court's prior decision in *Portillo-Munoz*. First, *Rahimi* involved a different statute – § 922(g)(8) versus § 922(g)(5). Second, Rahimi did not address the right of non-citizens, let alone those who are illegally present. Moreover, as stated earlier, this Court's analysis in *Portillo-Munoz* did not use means-end scrutiny, but instead used the plain text analysis the Supreme Court discussed in *Bruen* and described as being broadly consistent with *Heller*. *See Bruen*, 597 U.S. at 19; *Sitladeen*, 64 F.4th at 984; *see also Portillo-Munoz*, 643 F.3d at 440 ("The Court's language in *Heller* invalidates Portillo's attempt to extend the protections of the Second Amendment to illegal aliens"). This Court, therefore, should conclude that *Rahimi* does not impact its decision in *Portillo-Munoz*.[8]

If this Court disagrees, the Government believes *Rahimi* was wrongly decided, as evidenced by the petition for a writ of certiorari it filed. *See United States v. Rahimi*, 143 S. Ct. 2688 (2023); *see also*

---

[8] Under the rule of orderliness, one panel may not overturn another Fifth Circuit panel's decision unless there has been an intervening change in the law, such as by a statutory amendment, the Supreme Court, or the *en banc* court." *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021). For a Supreme Court decision to change this Circuit's law, "it 'must be more than merely illuminating with respect to the case before [the court]' and must 'unequivocally' overrule prior precedent." *Id.* (brackets original).

*Sitladeen*, 64 F.4th at 987 ("*Bruen* does not command us to consider only 'conduct' in isolation and simply assume that a regulated person is part of 'the people.' To the contrary, *Bruen* tells us to begin with a threshold question: whether the person's conduct is 'covered by' the Second Amendment's 'plain text.' And in *Flores* we did exactly that when we determined that the plain text of the Amendment does not cover *any* conduct by unlawfully present aliens. Thus, just as *Bruen* does not cast doubt on *Flores*'s interpretation of 'the people,' neither does it disavow *Flores*'s 'scope of the right' approach.") (emphasis original and citations omitted). As this Court knows, the Supreme Court granted certiorari and heard argument in *Rahimi* on November 7, 2023.

## VI. ASSUMING MEDINA-CANTU AND OTHER ILLEGAL ALIENS ARE ENTITLED TO SOME MEASURE OF PROTECTION UNDER THE SECOND AMENDMENT, § 922(g)(5)(A) IS CONSISTENT WITH AND SIMILAR TO THE RELEVANT HISTORICAL PRACTICE OF FIREARMS REGULATION

Even if this Court were to conclude that the Second Amendment applies to Medina-Cantu and other illegal aliens, § 922(g)(8) passes constitutional muster. Under *Bruen*, even where the plain text of the Second Amendment applies, the Government may justify a challenged restriction by showing "that its firearms regulation is part of the

historical tradition that delimits the outer bounds of the right to keep and bear arms." 597 U.S. at 19. Where § 922(g)(5) is in keeping with this nation's historical traditions, this Court should not declare it unconstitutional.

*Bruen* contemplated two avenues of historical inquiry. The first, applied in *Bruen* itself, is what the Supreme Court described as a "straightforward historical inquiry" which applies when "a challenged regulation addresses a general societal problem that has persisted since the 18th century." *Id*. at 26. The second avenue of inquiry is by "historical analogies." *Id*. at 27. *Bruen* recognized, however, that "the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id*. Where there is no such straightforward correspondence (as was the case with the blanket restrictions on gun possession by law-abiding citizens at issue in *Heller* and *Bruen*), *Bruen* directed courts to consider "historical analogies" to the challenged law to determine whether it resembles constitutionally accepted restrictions. *Id*. Under either avenue of inquiry, Medina-Canu's challenge to § 922(g)(5) fails.

## A.    SECTION 922(g)(5)(A) IS CONSISTENT WITH THE RELEVANT HISTORICAL PRACTICE AROUND FIREARMS REGULATION

Section 922(g)(5)(A) is consistent with and similar to relevant historical practice around firearms regulation.   The historical record supports the conclusion that the Second Amendment was understood to extend the right to bear arms only to citizens—and, indeed, only to specific categories of citizens—at the time of its ratification.   Under the English Bill of Rights, which "has long been understood to be the predecessor to the Second Amendment," the right to keep and bear arms was expressly limited to "Subjects."   *Heller*, 554 U.S. at 593 (quoting Bill of Rights 1689, 1 W. & M., ch. 2, § 7, Eng. Stat. at Large 441); *see id.* ("By the time of the founding, the right to keep and bear arms had become fundamental for English subjects.").

Also, "[i]n colonial America, the right to keep and bear arms 'did not extend to all New World residents.'"   *United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2021), *cert. denied,* 142 S. Ct. 1133 (2022) (Menashi, J., concurring in the judgment) (citing Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 140 (1996)).   Although "'[a]lien men . . . could speak, print, worship, enter into contracts, hold personal property in their own name, sue and be sued, and exercise

sundry other civil rights,' they 'typically could not vote, hold public office, or serve on juries' and did not have 'the right to bear arms' because these 'were rights of members of the polity.'" *Id.* (ellipsis original) (citing Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (1998)).

"The individual right to bear arms enshrined in the English Declaration of Rights—which 'has long been understood to be the predecessor to our Second Amendment'—was not made 'available to the whole population.'" *Jimenez-Shilon*, 34 F.4th at 1046 (citing *Heller*, 554 U.S. at 593). "Instead, it was limited to the 'Subjects which are Protestants, . . . suitable to their Conditions, and as allowed by Law.'" *Id.* (ellipsis original) (citing 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689)).

In *Jimenez-Shilon*, the Eleventh Circuit stated that it had "found no historical evidence indicating that aliens shared this fundamental right with either natural-born Brits or denizens (who might be thought of as naturalized British subjects), both of whose relationships to the sovereign mirrored that of American 'citizens.'" *Id.* The court added that, "indeed, the right to own guns in eighteenth-century England was statutorily restricted to the landed gentry." *Id.* (citing Patrick J. Charles,

*Armed in America* 51, 58 (2018); Giles Jacob, *A New Law-Dictionary* (1750) (unpaginated), *reprinted in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 300 (Neil H. Cogan ed., 2d ed. 2015)).  "[T]he English common law simultaneously made it such that 'aliens [were] incapacitated to hold lands.'"  *Id.* at 1046-47 (brackets original) (citing *Bayard v. Singleton*, 1 N.C. 5, 9 (1787) (emphasis omitted); *see Dawson's Lessee v. Godfrey*, 8 U.S. (4 Cranch) 321, 323-24, 2 L. Ed. 634 (1808); 1 William Blackstone, *Commentaries on the Laws of England* *372 (1765)); *see also Carpio-Leon*, 701 F.3d at 980 ("In England, the right to bear arms allowed the government to disarm those it considered disloyal or dangerous.").

Accordingly, colonial-era statutes did not extend the right to bear arms to those who were, at the time, not considered part of the citizenry who swore allegiance to the United States.  For instance, Massachusetts and Virginia forbade the arming of Native Americans.  *See* Malcolm, *supra*, at 140.  Virginia also prohibited Catholics from owning arms unless they swore "allegiance to the Hanoverian dynasty and to the Protestant succession."  *See* Robert H. Churchill, Gun Regulation, the

Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 L. & Hist. Rev. 139, 157 (2007).

Similarly, during the American Revolution, colonial governments disarmed persons who refused to "swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 506 (2004); *see id.* at 506 nn.128-129 (collecting statutes); *see generally* Churchill, *supra* at 159 ("[T]he new state governments . . . framed their police power to disarm around a test of allegiance."). Also, during the ratification debates, the New Hampshire ratification convention proposed an amendment stating that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion," while delegates urged the Massachusetts convention to propose a similar amendment guaranteeing "peaceable citizens" the right to keep arms. 2 Bernard Schwartz, The Bill of Rights: A Documentary History 681, 761 (1971); *see Heller*, 554 U.S. at 604 (considering ratification conventions' proposals). Accordingly, "[s]tate constitutions in the early republic continued a similar practice by restricting the right to keep and bear arms to citizens." *Perez*, 6 F.4th at 463 (Menashi, J., concurring in the

judgment) (citing constitutions from several states).  There is no question that illegal immigrants have not taken any oath of allegiance.

The Bill of Rights codified this understanding of the right to bear arms as being connected with membership in and preservation of the political community.  *See McDonald*, 561 U.S. at 769-70 ("The right of *the citizens* to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them." (emphasis added) (quoting 3 J. Story, 3038 Commentaries on the Constitution of the United States § 1890, p. 746 (1833)).

In addition, the Second Amendment is connected to the concept of "a well organized militia."  However, "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service." *Heller*, 554 U.S. at 628 (emphasis added); *see Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (explaining the history that "non-citizens . . . were neither expected, nor usually allowed, to participate in the militia"); *Jimenez-Shilon*, 34 F.4th

at 1048 (describing history of "disarmament of groups associated with foreign elements," including "on the ground of alienage").  There was no suggestion that any states were viewed at the time as lacking the authority to exclude noncitizens from the right to bear arms.  *See Bruen*, 597 U.S. at 30 (where there were "no disputes regarding the lawfulness of [certain] prohibitions," one "can assume it settled" that those prohibitions are "consistent with the Second Amendment").

In sum, § 922(g)(5)(A) disarms noncitizens who are unlawfully present in the United States.  The statute does not "burden a law-abiding citizen's right to armed self-defense" in a manner inconsistent with historical precedent.  *Bruen*, 597 U.S. at 29.  Instead, the statute fits squarely within a historical tradition that limited Second Amendment rights to particular classes of law-abiding citizens.

### B.    SECTION 922(g)(5)(A) IS SUFFICIENTLY ANALOGOUS TO HISTORIC EXCLUSIONS TO FIREARMS POSSESSION

Medina-Cantu argues that the Government cannot meet its burden to establish the requisite historical tradition because laws restricting entry into the country were enacted too late, but this argument overlooks *Bruen*'s direction to apply analogous historical precedents.  The statute is sufficiently analogous to early gun restrictions to support a conclusion

29

that the possession of firearms by unlawful noncitizens is not part of this country's historical tradition and is therefore unprotected under the Second Amendment.

*Bruen'*s call for analogical reasoning requires only that the Government identify a well-established and representative historical analogue, not "a historical twin." *See* 597 U.S. at 30. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster. While immigration is hardly a new phenomenon, illegal immigration is essentially a phenomenon that began in the late 19th century. *See United States v. Munoz-De La O*, 586 F. Supp. 3d 1032, 1036 (E.D. Wash. 2022) ("The federal government first forayed into the realm of immigration legislation during the 1870s. One decade later, the 1882 Chinese Exclusion Act prohibited Chinese laborers from entering the United States for ten years.") (citing Supreme Court cases that upheld the exclusion law on the basis that illegal immigrants could be removed at any time); *see also* U.S. Citizenship and Immigration Services, Early American Immigration Policies, https://www.uscis.gov/about-us/our-history/overview-of-inshistory/early-american-immigration-policies

(July 30, 2020) ("Americans encouraged relatively free and open immigration during the 18th and early 19th centuries, and rarely questioned that policy until the late 1800s."). When viewed in light of the colonial restrictions on firearms, the laws prohibiting illegal immigrants from bearing arms that followed close on the heels of the existence of illegal immigrants suggest a long-standing understanding that the Second Amendment does not extend to such individuals.

Although immigration was present in the 18th century, the relevant phenomenon of illegal immigration is one of more recent provenance than the Second Amendment, so that a restriction geared to illegal immigrants in the 18th century would not exist. Therefore, the courts must look to analogous firearms restrictions during the time of the Second Amendment.

The *Bruen* Court recognized that courts should be mindful of changing societal conditions in evaluating how closely a challenged regulation must conform to historical precedent. "While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 27.

The Government must identify only "a well-established and representative historical analogue." *Id.* The Government has precisely done that here, pointing to laws barring Native Americans, Catholics, and Loyalists, as well as others who did not take an oath of allegiance, from bearing arms. While many of these classifications are abhorrent and of course would be unconstitutional today under other constitutional provisions, *Drummond v. Robinson Twp.*, 9 F.4th 217, 228 n.8 (3d Cir. 2021), they nevertheless show that the right to bear arms was understood to be subject to the government's limitation of that right to those within the political community, i.e., law-abiding citizens.

In sum, even if this Court were to find that Medina-Cantu, as a non-law-abiding and undocumented noncitizen, is among "the people" to whom the Second Amendment guarantees the right to bear arms, § 922(g)(5)(A)'s prohibition on the possession of firearms by undocumented immigrants is consistent with, and analogous to, this Nation's historical practice of denying the right to possess firearms by those deemed outside the political community.

**AS MEDINA-CANTU CONCEDES, HIS CLAIM IS FORECLOSED THAT 18 U.S.C. § 922(g)(5)(A) IS UNCONSTITUTIONAL AS APPLIED TO HIM BECAUSE HE COULD BE CONVICTED BASED ONLY ON THE FIREARM AND AMMUNITION'S MANUFACTURE IN ANOTHER STATE (Issue Two)**

## I.    *DE NOVO* REVIEW APPLIES

Medina-Cantu contends § 922(g)(5) exceeds Congress's authority under the Commerce Clause. Specifically, he argues that 18 U.S.C. § 922(g)(5)(A) is unconstitutional as applied to him because it allowed a conviction based only on the firearm and ammunition's manufacture outside of, and subsequent importation to, the state in which they were possessed without regard to any involvement by Medina-Cantu in such transportation or in the economic activity associated with the purchase or sale of the firearm and ammunition. (Brief, p. 20). Ordinarily, this Court reviews a constitutional challenge *de novo*. *United States v. Shah*, 84 F.4th 190, 233 (5th Cir. 2023).

## II.    AS HE CONCEDES, MEDINA-CANTU'S COMPLAINT IS FORECLOSED

Article I, Section 8 of the United States Constitution confers upon Congress the power to regulate interstate commerce. (*See* Brief, p. 20). As Medina-Cantu acknowledges, the Supreme Court held in *Scarborough v. United States*, 431 U.S. 563, 575 (1977), in the context of 18 U.S.C. §

922(g)(1), there was "no indication that Congress intended to require any more than the minimal nexus that the firearm have been, at some time, in interstate commerce." He nevertheless suggests that *Scarborough* was somehow abrogated by *United States v. Lopez*, 514 U.S. 549, 559 (1995), which held that the interstate commerce "nexus" test requires an analysis of whether the regulated activity "substantially affects" interstate commerce. (*See* Brief, pp. 20-21). In fact, *Lopez* does not even mention *Scarborough*.

Medina-Cantu asserts various arguments complaining about the Congress's "unlimited power to regulate" and the failure to require that he "be engaged in the relevant [gun or ammunition] market at the time of the regulated conduct." He acknowledges, however, this Court rejected this argument in *United States v. Alcantar*, 733 F.3d 143, 145 (5th Cir. 2013). (*See* Brief, pp. 22-25). There, this Court reaffirmed its prior holding that § 922(g)(1) is a valid exercise of Congress's authority under the Commerce Clause. *Id.*

# <u>CONCLUSION</u>

This Court should affirm.

> Respectfully submitted,
>
> ALAMDAR S. HAMDANI
> United States Attorney
>
> CARMEN CASTILLO MITCHELL
> Chief, Appellate Division
>
> s/ *Eileen K. Wilson*
> EILEEN K. WILSON
> Assistant United States Attorney
>
> United States Attorney's Office
> 1000 Louisiana, Suite 2300
> Houston, Texas 77002
> Phone: (713) 567-9102
> Fax: (713) 718-3302
>
> ATTORNEYS FOR APPELLEE

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of FED. R. APP.
       P. 32(a)(7)(B) because it contains **6,847** words, excluding the parts
       of the brief exempted by FED. R. APP. P. 32(f).

2.    This brief complies with the typeface requirements of FED. R. APP.
       P. 32(a)(5) and the type style requirements of FED. R. APP. P.
       32(a)(6) because it has been prepared in a proportionally spaced
       typeface using Microsoft Word 2016 in Century Schoolbook, 14
       point font for text and 12 point font for footnotes.

3.    This brief complies with the privacy redaction requirement of 5TH
       CIR. R. 25.2.13 because it has been redacted of any personal data
       identifiers.

4.    This brief complies with the electronic submission of 5TH CIR. R.
       25.2.1, because it is an exact copy of the paper document.

5.    This brief is free of viruses because it has been scanned for viruses
       with the most recent version of McAfee Endpoint Security scanning
       program.

                              s/ *Eileen K. Wilson*
                              EILEEN K. WILSON
                              Assistant United States Attorney
                              Dated: December 13, 2023

## **CERTIFICATE OF SERVICE**

I certify that, December 13, 2023, a true and correct copy of this brief was electronically filed and served on opposing counsel. Upon notification that the electronically-filed brief has been accepted as sufficient and upon the clerk's request, seven paper copies of this brief will be placed in the United States Mail, postage prepaid, addressed to the Clerk. *See* 5TH CIR. R. 25.2.1; 5TH CIR. R. 31.1; 5TH CIR. ecf filing standard E(1).

s/ *Eileen K. Wilson*
EILEEN K. WILSON
Assistant United States Attorney