*FEDERAL PUBLIC DEFENDER*
*Southern District of Texas*
Lyric Office Centre
440 Louisiana Street, Suite 1350
Houston, Texas 77002-1056

**FEDERAL PUBLIC DEFENDER:**　　　　　　　　　　　　　　　　　　　　　**Telephone:**
　**MARJORIE A. MEYERS**　　　　　　　　　　　　　　　　　　　　　　　　713.718.4600

July 15, 2024

Fax:
713.718.4610

*VIA FIFTH CIRCUIT CM/ECF SYSTEM*
Mr. Lyle W. Cayce, Clerk
United States Court of Appeals
 for the Fifth Circuit
600 South Maestri Place
New Orleans, Louisiana 70130

　　RE:　*United States v. Jose Paz Medina-Cantu*, 5th Cir. No. 23-40336;
　　　　　Appellant's Supplemental Letter Brief

Dear Mr. Cayce:

　　In accordance with the Court's directive, Mr. Medina-Cantu submits this supplemental letter brief on *United States v. Rahimi*, No. 22-915, 602 U.S. ___ (June 21, 2024). The Supreme Court in *Rahimi* held that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." Slip op. at 17. The Court reached that conclusion after conducting the careful historical analysis now required by *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). Applying that framework to the statute in Mr. Medina-Cantu's case demonstrates that the government has not met its burden to prove that 18 U.S.C. § 922(g)(5) is constitutional.

### A. *Rahimi* confirms that *Bruen*'s historical analysis is the framework to analyze whether criminal prohibitions on firearm possession are consistent with the Second Amendment.

　　*Rahimi* supports Mr. Medina-Cantu's argument that *Bruen* abrogated this Court's Second Amendment precedent, including *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011), Br. for Appellant ("Def. Br.") 7-12; Reply Br. for

Mr. Lyle W. Cayce, Clerk
July 15, 2024
Page 2 of 5

Appellant 2-3, and refutes the government's contrary argument, Br. of Plaintiff-Appellee ("Gov't Br.") 10-22. As the Supreme Court did in *Bruen*, the Court in *Rahimi* explained that, "when a firearm regulation is challenged under the Second Amendment, the Government must show that the restriction 'is consistent with the Nation's historical tradition of firearm regulation.'" Slip op. at 4 (quoting *Bruen*, 597 U.S. at 24). The Court in *Rahimi* characterized *Bruen* as "direct[ing] courts to examine our 'historical tradition of firearm regulation' to help delineate the contours of the right." Slip op. at 6 (quoting *Bruen*, 597 U.S. at 17).

Furthermore, the Court in *Rahimi* described the required historical analysis under *Bruen* as follows:

> [T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, apply[ing] faithfully the balance struck by the founding generation to modern circumstances. . . .
>
> Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster. The law must comport with the principles underlying the Second Amendment, but it need not be a dead ringer or a historical twin.

Slip op. at 7 (internal quotation marks and citations to *Bruen* omitted).

This Court did not engage in any historical analysis in *Portillo-Munoz*. *See* 643 F.3d at 438-42. Accordingly, *Portillo-Munoz* cannot be squared with *Bruen* and *Rahimi* and has been abrogated by them.

Mr. Lyle W. Cayce, Clerk
July 15, 2024
Page 3 of 5

### B. *Rahimi* rejected the government's argument that Second Amendment rights extend only to "law-abiding, responsible citizens."

The government's primary argument in *Rahimi* was that the Second Amendment permits Congress to disarm persons who are not "law-abiding, responsible citizens." Br. for the United States 10-27 (No. 22-915). The government created that rule from dicta in *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion), and *Bruen*. The Supreme Court in *Rahimi* firmly rejected the government's proposed rule:

> Finally, in holding that Section 922(g)(8) is constitutional as applied to Rahimi, we reject the Government's contention that Rahimi may be disarmed simply because he is not "responsible." Brief for United States 6; see Tr. of Oral Arg. 8-11. "Responsible" is a vague term. It is unclear what such a rule would entail. Nor does such a line derive from our case law. In *Heller* and *Bruen*, we used the term "responsible" to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. See, *e.g.*, *Heller*, 554 U.S., at 635; *Bruen*, 597 U.S. at 70. But those decisions did not define the term and said nothing about the status of citizens who were not "responsible."

Slip op. at 17.

The *Rahimi* majority opinion did not address the "law-abiding" portion of the government's proposed rule because the government disclaimed reliance on it at oral argument. *See* Tr. of Oral Arg. 8-9.[1] But the government invoked the same passages from *Heller* and *Bruen* for both the "law-abiding" and "responsible" portions of its proposed rule, *see* Br. for the United States 11-12 & n.1, and so the Supreme Court's rejection of the government's view of those passages applies to both terms. Moreover, Justice Thomas in his dissenting opinion agreed with the majority's rejection of the government's proposed rule, observing that "[n]ot a single Member of the Court adopts the Government's theory" that "the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.'" *Rahimi*, slip op. at 27 (Thomas, J., dissenting). This Court got it right in *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), *cert. granted, judgment vacated*, No. 23-376, 2024 WL

---

[1] Available at https://www.supremecourt.gov/oral_arguments/argument_transcript/2023

Mr. Lyle W. Cayce, Clerk
July 15, 2024
Page 4 of 5

3259662 (U.S. July 2, 2024), when it rejected the government's reliance on the "law-abiding, responsible citizens" language from *Heller* and *Bruen* as "read[ing] too much into the Supreme Court's chosen epithet." *Id.* at 342-43.

The government has made the same argument in Mr. Medina-Cantu's case. *See, e.g.*, Gov't Br. 12 ("[i]llegal aliens are not 'law-abiding, responsible citizens' or 'members of the political community'") (quoting *Portillo-Munoz*, 643 F.3d at 440); Gov't Br. 32 (arguing that the government has met its burden by "pointing to laws barring Native Americans, Catholics, and Loyalists, as well as others who did not take an oath of allegiance, from bearing arms," even though "many of these classifications are abhorrent and of course would be unconstitutional today," because "they nevertheless show that the right to bear arms was understood to be subject to the government's limitation of that right to those within the political community, i.e., *law-abiding citizens*") (emphasis added). That argument does not survive *Rahimi*.

### C. *Rahimi* undermines the government's reliance on pre-founding laws and laws targeting Native Americans, Catholics, and British Loyalists.

In his opening and reply briefs, Mr. Medina-Cantu argued that the government could not meet its burden under *Bruen* because there is no historical tradition, particularly from the founding era, of disarming all aliens illegally present in the United States. Def. Br. 12-19; Reply Br. 3-6. Those arguments remain viable after *Rahimi*, and Mr. Medina-Cantu will not repeat them here.

He will add that *Rahimi* undermines the government's reliance on the pre-founding laws. *See* Gov't Br. 24-27. In *Rahimi*, the Supreme Court explained that, through the centuries pre-dating the founding, "English law had disarmed not only brigands and highwaymen but also political opponents and disfavored religious groups. By the time of the founding, however, state constitutions and the Second Amendment had *largely eliminated* governmental authority to disarm political opponents on this side of the Atlantic." Slip op. at 9-10 (emphasis added) (citing *Heller*, 554 U.S. at 594-595, 600-603). The government, therefore, cannot meet its burden by relying on those pre-founding laws.

Finally, the Court's historical analysis in *Rahimi* supports Mr. Medina-Cantu's argument that laws targeting Native Americans, Catholics, and British Loyalists are too dissimilar in their purpose to justify § 922(g)(5). Def. Br. 16-18; Reply Br. 5-6.

In *Rahimi*, the Supreme Court found that § 922(g)(8)(C)(ii) was constitutional based on the government's identification of two founding era historical laws—surety laws and "going armed" laws—that were relevantly similar to § 922(g)(8)(C)(ii) "in both why and how" they burden the Second Amendment right. Slip op. at 14. All three "applie[d] to individuals found to threaten the physical safety of another." *Id.* All three "restrict[ed] gun use to mitigate demonstrated threats of physical violence." *Id.* And all three "involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* Furthermore, both surety laws and § 922(g)(8)(C)(ii) imposed "temporary" restrictions of "limited duration." And, § 922(g)(8)(C)(ii) imposed a "lesser restriction of temporary disarmament" than the permissible penalty of imprisonment provided for in the "going armed" laws. *Id.* In light of all of those specific similarities, the Supreme Court upheld § 922(g)(8)(C)(ii).

In Mr. Medina-Cantu's case, the government attempts to rely on laws disarming Native Americans, Catholics, and British Loyalists without engaging at the level of specificity required by *Rahimi* and *Bruen*. Those laws did not disarm people because of their unlawful presence like § 922(g)(5) does. Instead, they disarmed people because of their membership in a group that was in active conflict with the United States. Reply Br. 5-6 (citing *United States v. Sing-Ledezma*, __ F. Supp. 3d __, No. EP-23-CR-823(1)-KC, 2023 WL 8587869, at *14-*17 (W.D. Tex. Dec. 11, 2023) (citing *Daniels*, 77 F.4th at 354). The connection the government tries to make is at too high of a level of generality to pass muster under *Rahimi* and *Bruen*.

Respectfully submitted,

s/ Kathryn Shephard
KATHRYN SHEPHARD
Assistant Federal Public Defender
Attorney for Appellant

## CERTIFICATE OF SERVICE

All parties required to be served with copies of this document have been so served by filing via the Fifth Circuit ECF filing system.

s/ Kathryn Shephard
KATHRYN SHEPHARD