

**U.S. Department of Justice**
United States Attorney
Southern District of Texas

*1000 Louisiana Street, Suite 2300*   Telephone: (713) 567-9102
*Houston, Texas 77002*   Fax: (713) 718-3302

July 31, 2024

The Hon. Lyle W. Cayce, Clerk
United States Court of Appeals
  for the Fifth Circuit
600 S. Maestri Place
New Orleans, Louisiana 70130

      Re:    *United States v. Jose Paz Medina-Cantu,* 5th Cir. No. 23-40336 – Plaintiff-Appellee's Supplemental Letter Brief

Dear Mr. Cayce:

The Government submits this supplemental letter brief in response to this Court's July 3, 2024, directive to address the impact of the Supreme Court's decision in *United States v. Rahimi*, 602 U.S. ---, 144 S. Ct. 1889 (June 21, 2024), on this case. In *Rahimi*, the Supreme Court held that 18 U.S.C. § 922(g)(8), which prohibits firearm possession by an individual who is subject to a domestic violence restraining order, does not violate the Second Amendment on its face or as applied to that defendant. *Id.* at 1902.

Although *Rahimi* clarified the methodology that governs Second Amendment challenges, it did not "undertake an exhaustive analysis … of the full scope of the Second Amendment." *Id.* at 1903 (ellipsis original). *Rahimi* thus did not undermine the Government's argument that illegally present non-citizens are not among "the people." Nor did *Rahimi* abrogate this Court's decision in *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011). In any event, *Rahimi*'s reasoning supports the Government's position that 18 U.S.C. § 922(g)(5)(A) is consistent with the Second Amendment and undermines Medina-Cantu's contrary arguments.

      **I.**    ***Rahimi* Clarified the Analytical Framework Governing Second Amendment Challenges.**

In *Rahimi*, the Supreme Court upheld Section 922(g)(8) under the Second Amendment. The Court explained that "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 1896. Those provisions include surety laws, which authorized magistrates to "require individuals suspected of future misbehavior to post a bond," and historical "going armed" laws, which "provided a

mechanism for punishing those who had menaced others with firearms." *Id*. at 1899-900. The Court concluded that "[t]aken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id*. at 1901. Although "Section 922(g)(8) is by no means identical to these founding era regimes," the Court stated that "it does not need to be." *Id*. Section 922(g)(8)'s "prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id*.

In reaching its decision, the Court clarified that its Second Amendment precedents do not demand "a law trapped in amber." *Id*. at 1897. Just as the Second Amendment is "not limited only to those arms that were in existence at the founding," so too it "permits more than just those regulations identical to ones that could be found in 1791." *Id*. at 1897-98. As Justice Barrett emphasized in her concurrence, "imposing a test that demands overly specific analogues has serious problems," including "forc[ing] 21st-century regulations to follow late-18th-century policy choices," and "assum[ing] that founding-era legislatures maximally exercised their power to regulate." *Id*. at 1925 (Barrett, J., concurring).

As the Court explained, when assessing whether a law complies with the Second Amendment, a court should consider "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition" by ascertaining "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id*. at 1898 (emphasis added). Under this standard, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id*. But even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster,'" so long as the law "comport[s] with the principles underlying the Second Amendment." *Id*.

## II. *Ramini* Did Not Undermine this Court's Pre-Existing Precedent.

*Rahimi* did not undermine this Court's prior holding that 18 U.S.C. § 922(g)(5)(A) is constitutional under the Second Amendment. *See Portillo-Munoz*, 643 F.3d at 442. In *Portillo-Munoz*, this Court determined that the protections contained in the Second Amendment do not extend to aliens illegally present in the United States. *See id*. at 440, 442. This Court explained that "'the people' protected by the … Second Amendment[] … refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id*. at 440; *see District of Columbia v. Heller,* 554 U.S. 570, 580 (2008); *United States v. Verdugo-Urquidez*, 494 U.S. 259,

2

265 (1990). This Court concluded that *Heller* invalidated the defendant's attempt to extend the protections of the Second Amendment to illegal aliens who are not citizens or members of the political community. *Portillo-Munoz,* 643 F.3d at 440. As this Court stated, "aliens who enter or remain in this country illegally and without authorization are not Americans as that word is commonly understood." *Id.* Indeed, this Court noted that "the Supreme Court has long held that Congress has the authority to make laws governing the conduct of aliens that would be unconstitutional if made to apply to citizens." *Id.* at 441.

Nothing in *Rahimi* undermines this Court's reasoning. To the contrary, the Supreme Court in *Rahimi* emphasized what its prior precedents observed: the Second Amendment extends to "ordinary *citizens*." 144 S. Ct. at 1903 (emphasis added); *see also id.* at 1897, 1902 (referring to the right as belonging to "citizens"); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 8-10, 15, 26, 29, 31, 38, 50, 55, 60, 71 (2022); *Heller,* 554 U.S. at 576, 579-81, 594-95, 599, 629.

Medina-Cantu contends that *Portillo-Munoz* is no longer good law because this Court did not engage in an in-depth historical analysis. According to Medina-Cantu, *Rahimi* invariably requires courts to engage in a historical analysis any time someone raises a Second Amendment challenge to a firearm regulation. To the contrary, *Rahimi* confirmed the Government need only justify a modern regulation using historical analogues "when the Government regulates arms-bearing conduct." 144 S. Ct. at 1897. That is, only "when the Second Amendment's plain text covers an individual's conduct" must the Government "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen,* 597 U.S. at 17. Because, as *Portillo-Munoz* discussed, the Second Amendment's plain text does not cover unlawfully present non-citizens, this Court did not need to assess whether Section 922(g)(5) is consistent with history and tradition. This Court's decision in *Portillo-Munoz* thus remains good law that noncitizens illegally present in the United States lack Second Amendment rights. At a minimum, *Portillo-Munoz*'s reasoning is persuasive.

*Portillo-Munoz* aside, the Government maintains that illegally present non-citizens are not covered by the Second Amendment because they are not among "the people," which as *Heller* and *Bruen* explained, refers to "Americans" and "members of the political community." *See Bruen,* 597 U.S. at 9, 26, 29, 31, 38, 70; *Heller,* 554 U.S. at 581, 595, 608, 625, 635.

### III. Even Assuming the Second Amendment's Text Covers Illegally Present Non-Citizens, *Rahimi* Supports the Government's Position that Disarming Illegal Aliens Is Consistent with Our Nation's Historical Tradition of Firearm Regulation.

As explained in the Government's principal brief, even if unlawfully present

3

non-citizens are covered by the Second Amendment's text, Section 922(g)(5) is consistent with and analogous to our nation's historical tradition. (*See* Appellee's Br. 22-32).

Several aspects of *Rahimi* also support the Government's position that Section 922(g)(5) is historically justified. For example, *Rahimi* focused on "principles that underpin our regulatory tradition," rather than one-to-one correspondence with historical laws. *See* 144 S. Ct. at 1898. The Court emphasized that, even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). The Court repeated: "The law must comport with *the principles* underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (emphasis added) (quoting *Bruen*, 597 U.S. at 30). *Rahimi*, therefore, confirms that specific historical laws may reflect broader principles that can be applied to uphold modern firearms laws.

Moreover, *Rahimi* clarified that courts should not take a "divide-and-conquer approach" to historical evidence. *United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024). Instead, just as *Rahimi* did with surety and "going armed" law, even "distinct" strains of history can, "[t]aken together," be a sufficient basis to uphold modern firearm regulations. *See Rahimi*, 144 S. Ct. at 1899, 1901.

These principles support the Government's position that Section 922(g)(5) is constitutional. By its plain text, the Second Amendment does not protect the right of a person who is not a citizen and who is illegally or unlawfully present in the United States to keep and bear arms. "The people" who enjoy that right have never been understood to include individuals who are outside of the political community. Instead, as history shows, and as the Supreme Court has stated time and again, the Second Amendment's protections extend only to "citizens."

Section 922(g)(5)(A) is constitutional under this nation's historical tradition of firearms regulation as well. First, there is abundant precedent before, during, and after the American Revolution for disarming individuals who were not members of the political community. Second, there is a historical tradition of disarming untrustworthy adherents of the law. Standing alone, and in combination, these regulatory regimes and historical traditions are "relevantly similar" to Section 922(g)(5)(A).

### IV. Medina-Cantu's Counterarguments Misread *Rahimi* and Invoke the Same Methodological Errors that the Supreme Court Rejected.

Medina-Cantu argues that *Rahimi* rejected the Government's "law-abiding, responsible citizens" argument and that the Government may no longer rely on it.

However, the Supreme Court merely rejected the Government's reliance on the Court's unadorned statement that the Second Amendment extends to "responsible" citizens as imposing some limitation on the right to keep and bear arms. *See id.* at 1903. *Rahimi* did not undermine the Government's substantive argument—that history and tradition support the Government's authority to disarm categories of individuals whose firearm possession poses a risk of harm to others. Rather, the Court explained that its opinion should not be taken to cast doubt on laws that do just that. *Id.* at 1901.

Medina-Cantu also contends that *Rahimi* bars the Government from relying on pre-founding analogues, but the Second Amendment enshrined a "pre-existing right." *Heller*, 554 U.S. at 592. The Second Amendment thus carries with it the pre-existing meaning, based in part on English practice, that preceded its ratification. Not even *Rahimi* forewent reliance on pre-founding traditions. *Rahimi* itself relied on pre-founding resources as establishing a tradition that justifies Section 922(g)(8). *See* 144 S. Ct. at 1899-900, 1901.

This Court also should reject Medina-Cantu's argument that because laws disarming Native Americans, Catholics, and Loyalists "did not disarm people because of their unlawful presence like Section 922(g)(5) does," they are not relevantly similar. Medina-Cantu effectively demands a historical twin of the sort that the Supreme Court in *Rahimi* rejected. Historical laws disarming groups because they lacked membership in the political community or who were unwilling to comply with the law are sufficiently similar to Section 922(g)(5). Under *Rahimi*, that is enough. *See id.* at 1901 (explaining that "Section 922(g)(8) is by no means identical to … founding era regimes, but it does not need to be").

For these reasons and those explained in the Government's prior briefing, the district court's judgment should be affirmed.

> Respectfully submitted,
>
> ALAMDAR S. HAMDANI
> United States Attorney
>
> CARMEN CASTILLO MITCHELL
> Chief, Appellate Division
>
> s/ *Eileen K. Wilson*
> EILEEN K. WILSON
> Assistant United States Attorney

cc:   Ms. Kathryn Shephard