# United States Court of Appeals for the Fifth Circuit

No. 23-40336

United States Court of Appeals
Fifth Circuit

**FILED**

August 27, 2024

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

JOSE PAZ MEDINA-CANTU,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:22-CR-426-1

Before KING, HO, and ENGELHARDT, *Circuit Judges.*

PER CURIAM:

In *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011), this court held that 18 U.S.C. § 922(g)(5), which prohibits an illegal alien from possessing a firearm or ammunition, is constitutional under the Second Amendment. In the present case, Defendant-Appellant Jose Paz Medina-Cantu brings another Second Amendment challenge to § 922(g)(5), arguing that *Portillo-Munoz* has been abrogated by the Supreme Court's decisions in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United*

No. 23-40336

*States v. Rahimi*, 144 S. Ct. 1889 (2024).[1] The Government, on the other hand, contends that *Portillo-Munoz* remains good law.

We agree with the Government and hold that the Supreme Court's decisions in *Bruen* and *Rahimi* did not unequivocally abrogate *Portillo-Munoz*'s precedent. As such, under this circuit's rule of orderliness, we are bound to follow *Portillo-Munoz*. The district court's judgment is AFFIRMED.

## I.

On July 13, 2022, Defendant-Appellant Jose Paz Medina-Cantu was charged with possession of a firearm and ammunition as an illegal alien in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2), and illegal reentry into the United States in violation of 8 U.S.C. § 1326(a) and (b). On November 14, 2022, Medina-Cantu moved to dismiss the count of his indictment charging him with unlawful possession, arguing that § 922(g)(5) is unconstitutional in light of the Supreme Court's decision in *Bruen*. The district court denied Medina-Cantu's motion, holding that *Bruen* did not abrogate this court's decision in *Portillo-Munoz*, which held that "the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States." *See Portillo-Munoz*, 643 F.3d at 442; U.S. Const. amend. II (enshrining "the right of *the people* to keep and bear Arms" (emphasis added)).

On February 23, 2023, Medina-Cantu appeared before the district court and pleaded guilty to both counts of his indictment without a plea

---

[1] Medina-Cantu also argues that § 922(g)(5), as applied to him, exceeds Congress's authority under the Commerce Clause, but he acknowledges that this argument is foreclosed. *See United States v. Seekins*, No. 21-10556, 2022 WL 3644185, at *2 (5th Cir. Aug. 24, 2022) (summarizing precedent).

No. 23-40336

agreement. During this hearing, Medina-Cantu expressly preserved his argument that § 922(g)(5) is unconstitutional under the Second Amendment. On May 31, 2023, the district court sentenced Medina-Cantu to fifteen months of imprisonment, followed by two years of supervised release. This appeal followed.

## II.

On appeal, Medina-Cantu argues that 18 U.S.C. § 922(g)(5) is unconstitutional in light of the Supreme Court's decisions in *Bruen* and *Rahimi*. We review a preserved challenge to the constitutionality of a federal statute *de novo*. *United States v. Penn*, 969 F.3d 450, 459 (5th Cir. 2020).

As noted above, this court held in *Portillo-Munoz* that § 922(g)(5) is constitutional under the Second Amendment, reasoning that the phrase "the people" in the Second Amendment does not include aliens unlawfully present in the United States. 643 F.3d at 442. Under this circuit's rule of orderliness, a three-judge panel "may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court." *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (quoting *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008)). "In particular, for a Supreme Court decision to change our Circuit's law, it 'must be more than merely illuminating with respect to the case before [the court]' and must 'unequivocally' overrule prior precedent." *Tech. Automation Servs. Corp. v. Liberty Surplus Ins.*, 673 F.3d 399, 405 (5th Cir. 2012) (alteration in original) (quoting *Martin v. Medtronic, Inc.*, 254 F.3d 573, 577 (5th Cir. 2001)). Accordingly, unless we can conclude that *Bruen* and/or *Rahimi* "unequivocally" abrogated *Portillo-Munoz*, Medina-Cantu's Second Amendment challenge fails due to the rule of orderliness.

No. 23-40336

In *Portillo-Munoz*, this court adjudicated the constitutionality of § 922(g)(5) in light of the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), which held that the Second Amendment guarantees an individual right to possess and carry firearms. *See Portillo-Munoz*, 643 F.3d at 439–42. We noted that although the Supreme Court in *Heller* did not purport to "clarify the entire field" of the Second Amendment, *id.* at 440 (quoting *Heller*, 554 U.S. at 635), "the Court's language d[id] provide some guidance as to the meaning of the term 'the people' as it is used in the Second Amendment," *id.* Namely, we highlighted that the Court in *Heller* held that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* (quoting *Heller*, 554 U.S. at 635). We also noted the Court's conclusions that the term "the people" is generally employed in the Constitution to refer to "all members of the political community," and that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* (quoting *Heller*, 554 U.S. at 580–81).

Drawing upon this language in *Heller*, we concluded that "[i]llegal aliens are not 'law-abiding, responsible citizens' or 'members of the political community,' and aliens who enter or remain in this country illegally and without authorization are not Americans as that word is commonly understood." *Id.* Accordingly, we held that the Second Amendment's protections do not extend to illegal aliens, and that § 922(g)(5) is therefore constitutional under the Amendment. *Id.* at 440, 442.

In *Bruen*, the Supreme Court clarified the proper framework for adjudicating Second Amendment challenges. The Court noted that many lower courts, since *Heller*, had developed a two-step test for assessing Second Amendment claims. *Bruen*, 597 U.S. at 18. At step one, the Government could justify its regulation by "establish[ing] that the challenged law

regulates activity falling outside the scope of the right as originally understood." *Id.* (alteration in original) (quoting *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019), *abrogated by Bruen*, 597 U.S. 1). If the Government was able to show that the regulated conduct falls outside of the Second Amendment's original scope, the court would conclude that the regulated activity is categorically unprotected. *Id.* If the historical evidence at step one was "inconclusive or suggest[ed] that the regulated activity is *not* categorically unprotected," courts would move on to step two, and analyze "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.* (quoting *Kanter*, 919 F.3d at 441). If a "core" Second Amendment right (e.g., the right to self-defense in the home) was burdened, courts applied a strict scrutiny standard. *Id.* at 18–19. Otherwise, courts would apply intermediate scrutiny. *Id.* at 19.

The Supreme Court in *Bruen* found that step one was "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* But the Court found that step two, referred to as "means-end scrutiny," "[was] inconsistent with *Heller*'s historical approach." *Id.* at 24. Accordingly, the Court clarified the proper standard for adjudicating Second Amendment challenges:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961)).

To assess the constitutionality of § 922(g)(5) under *Bruen*'s standard, we must first assess whether the Second Amendment's plain text covers the

No. 23-40336

conduct regulated by the statute. If the answer to that question is yes, then the Government must justify § 922(g)(5) by demonstrating that it is consistent with the United States's historical tradition of firearm regulation.

Under *Bruen*'s standard, our precedent dictates that Medina-Cantu's Second Amendment challenge fails at this first step. We held in *Portillo-Munoz* that the Second Amendment's plain text does not cover the conduct of aliens who are unlawfully present in the United States. Consistent with *Bruen*'s mandate, we reached our decision in *Portillo-Munoz* by interpreting the text of the Second Amendment—i.e., the meaning of the phrase "the people"—and we did *not* engage in the "means-end scrutiny" practice that the Supreme Court prohibited in *Bruen*. Additionally, *Bruen* provided no clarification as to the meaning of "the people" in the Second Amendment. As Justice Alito noted in his concurring opinion, *Bruen* "decide[d] nothing about *who* may lawfully possess a firearm." *Bruen*, 597 U.S. at 72 (Alito, J., concurring) (emphasis added); *see also id.* at 31–32 (noting that it was undisputed that the petitioners raising the Second Amendment challenge were "ordinary, law-abiding, adult citizens"—"part of 'the people' whom the Second Amendment protects"). Accordingly, we find that the Supreme Court's decision in *Bruen* did not abrogate *Portillo-Munoz*.[2]

Having concluded that *Portillo-Munoz* survived *Bruen*, we turn next to *Rahimi*. In *Rahimi*, the Supreme Court clarified the analytical framework

---

[2] We note that our discussion of *Bruen* largely mirrors that of our colleagues on the Eighth Circuit in *United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023), which addressed substantively the same issue as the case before this court. The Eighth Circuit, post-*Heller* and pre-*Bruen*, had held that "the protections of the Second Amendment do not extend to aliens illegally present in this country." *See id.* at 983 (quoting *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011)). After *Bruen*, a three-judge panel of the Eighth Circuit held that it remained bound by its pre-*Bruen* precedent in rejecting a Second Amendment challenge to § 922(g)(5), for essentially the same reasons described above. *See id.* at 985–86.

articulated in *Bruen*. Namely, the Court noted that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897–98. Therefore, as the Court held, when determining whether a regulation is consistent with the United States's historical tradition of firearm regulation, courts must examine "principles that underpin our regulatory tradition," but they need not identify a precise historical analogue to deem that regulation constitutional under the Second Amendment. *Id.* at 1898.

Rahimi, like *Bruen*, did not unequivocally abrogate our precedent that the plain text of the Second Amendment does not encompass illegal aliens. *Rahimi*, like *Bruen*, provides little clarification as to *who* is protected by the Second Amendment. It is true that the Government in *Rahimi* advanced the theory that the Second Amendment protects only "law-abiding, responsible citizens." *Id.* at 1944 (Thomas, J., dissenting). The majority in *Rahimi* acknowledged this argument only in part, explaining that the term "responsible"—as utilized in *Heller* and *Bruen*—was employed to "describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right." *Id.* at 1903. The Supreme Court concluded that "those decisions did not define the term and said nothing about the status of citizens who were not 'responsible.'" *Id.* As Medina-Cantu notes, this portion of *Rahimi* may indicate that this court in *Portillo-Munoz* overread *Heller*'s "law-abiding, responsible citizens" language. But while *Rahimi* would undoubtedly be "illuminating" if we were to reconsider *Portillo-Munoz*, we cannot conclude that *Rahimi* unequivocally abrogated our prior holding that illegal aliens are not "members of the political community" covered by the Second Amendment. *See Tech. Automation*, 673 F.3d at 405; *Portillo-Munoz*, 643 F.3d at 440.

We acknowledge that there are reasonable arguments as to why *Portillo-Munoz* should be reconsidered post-*Bruen* and *Rahimi*. For instance,

No. 23-40336

*Portillo-Munoz*'s textual interpretation of the Second Amendment notably did not include a historical analysis, relying instead on the Supreme Court's language in *Heller*. *See Portillo-Munoz*, 643 F.3d at 439–42. And *Rahimi*'s discussion of the term "responsible" provides some indication that the Supreme Court may, in future cases, reject other arguments that the Second Amendment's reference to "the people" excludes certain individuals. But, absent clearer indication that *Portillo-Munoz* has been abrogated, only the Supreme Court—or this court sitting *en banc*—can overturn our precedent.

\*        \*        \*

To summarize, this court held in *Portillo-Munoz* that illegal aliens are not "members of the political community" covered by the plain text of the Second Amendment. 643 F.3d at 440, 442. The majority opinions in *Bruen* and *Rahimi* did not address this issue, nor did they unequivocally abrogate our holding in *Portillo-Munoz*. Accordingly, following the rule of orderliness, we are bound to follow *Portillo-Munoz* and uphold the constitutionality of § 922(g)(5) under the Second Amendment. The district court's judgment is AFFIRMED.

No. 23-40336

Jᴀᴍᴇs C. Hᴏ, *Circuit Judge*, concurring in the judgment:

The Second Amendment protects the right of "the people" to keep and bear arms. Our court has held that the term "the people" under the Second Amendment does not include illegal aliens. *See United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011).

The defendant here contends that *Portillo-Munoz* is no longer good law, in light of recent decisions from the Supreme Court. But there's no basis to question our precedent.

To begin with, no Supreme Court precedent compels the application of the Second Amendment to illegal aliens—and certainly not *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), or *United States v. Rahimi*, 602 U.S. _ (2024). That should be the end of the matter. We should not extend rights to illegal aliens any further than what the law requires. *Cf. Young Conservatives of Texas Foundation v. Smatresk*, 78 F.4th 159, 166 (5th Cir. 2023) (Ho, J., dissenting from denial of rehearing en banc) ("Our national objectives are undercut when [we] encourage illegal entry into the United States.").

Moreover, it's already well established that illegal aliens do not have Second Amendment rights. In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Court noted that "the people" is "a term of art employed in select parts of the Constitution"—namely, the First, Second, Fourth, Ninth, and Tenth Amendments. *Id.* at 265. The term "refers to a class of persons who are *part of a national community* or who have otherwise developed sufficient connection with this country to be considered *part of that community*." *Id.* (emphasis added).

To be sure, *Verdugo-Urquidez* involved the interpretation of the Fourth Amendment, not the Second. But the Court later quoted this same

No. 23-40336

passage verbatim when it was determining the proper reading of the Second Amendment in *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008).

Illegal aliens don't qualify under the definition of "the people" set forth in *Verdugo-Urquidez* and *Heller*—not as a matter of common sense or Court precedent.

As to common sense, an illegal alien does not become "part of a national community" by unlawfully entering it, any more than a thief becomes an owner of property by stealing it. *Id.*

And as to precedent, the Court has repeatedly explained that "an alien . . . does not become one of *the people* to whom these things are secured by our Constitution *by an attempt to enter forbidden by law.*" *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904) (quoted in *Verdugo-Urquidez*, 494 U.S. at 265) (emphasis added). But that's, of course, the very definition of an illegal alien—one who "attempts to enter" our country in a manner "forbidden by law." So illegal aliens are not part of "the people" entitled to the protections of the Second Amendment.

Moreover, the Court has provided further reason why it reaches this conclusion. For an illegal alien "[t]o appeal to the Constitution is to concede that this is a land governed by that supreme law." *Id.* And "the power to exclude [aliens from the United States] has been determined to exist" under our Constitution. *Id.* So, the Court concluded, "those who are excluded cannot assert the rights in general obtaining in a land to which they do not belong as citizens or otherwise." *Id.*

I concur in the judgment.